Mark Anthony DELAPAZ, Appellant,

v.

**The STATE of Texas, Appellee.**

No. 05–05–00660–CR.

Court of Appeals of Texas,
Dallas.

March 28, 2007.

Rehearing Overruled Aug. 3, 2007.

F. Clinton Broden, Broden & Mickelsen, Dallas, for Appellant.

William T. (Bill) Hill, Jr., Criminal District Atty., Patricia Poppoff Noble, Assistant District Atty., Lori L. Ordiway, Assistant District Atty. for Dallas County, Chief of the Appellate Div., Dallas, for The State.

Before Justices WRIGHT, LANG–MIERS, and MAZZANT.

## OPINION

Opinion by Justice MAZZANT.

Mark Anthony Delapaz appeals his conviction for tampering with or fabricating physical evidence. In eight issues, he alleges the district attorney improperly appointed a de facto attorney pro tem; indictment error; error in the denial of a severance; error in the admission of evidence; charge error; and *Brady* violations. We affirm the trial court's judgment.

### BACKGROUND

Appellant does not challenge the legal or factual sufficiency of the evidence to sustain his conviction. Because the background and facts are pertinent to the issues, however, we shall review the applicable facts.

1. The indictment reads:
 On or about the 23rd day of October A.D., 2001 in the County of Dallas and said State, [defendant] did then and there, knowing that an official proceeding and investigation was pending and in progress, to wit: a Dallas Police Department Narcotics Division Investigation, with intent to affect the outcome of the official proceeding and investigation, did make and present and use a document, to wit: an affidavit for a search warrant and arrest warrant, hereinafter 'affidavit,' dated the 23rd day of October 2001 for the premises located at 5972 Marine Way, Dallas, Texas, with knowledge of its falsity in that the defendant knew that the affidavit contained defendant's false statement and false information that the confidential informant was reliable and that in *the past defendant had received* information from the confidential informant about persons who traffic drugs in the Dallas County area and on each and every occation [sic] the informant had proved to be true, reliable and correct. . . .

2. During the pretrial hearing, the State argued it was not required to prove the identity

*The Identity of the Confidential Informant*

This case concerns false statements appellant allegedly made and presented to a Dallas County magistrate on October 23, 2001, in obtaining a search warrant for the residence of Jose Mendoza at 5972 Marine Way, in Dallas, Texas. The indictment alleged appellant obtained the search warrant based on an affidavit in which he falsely alleged he had previously received information from a reliable and confidential informant, he "had received information in the past from the said confidential and reliable informant about persons who traffic drugs in the Dallas County area and on each and every occasion," and the informant had proven "to be true, reliable and correct." [1]

The identity of the confidential informant referred to in the Mendoza search warrant affidavit was an important issue in the case. In a pretrial hearing, the trial court ruled the State had to prove the identity of the confidential informant. [2] In of the confidential informant because the identity of the informant was not essential to the allegations in the indictment. The record contains the following discussion between a prosecutor and the trial court:

[PROSECUTOR]: May it please the court. The defense moved that we have to elect the evidence we are going to present.
THE COURT: Let me pause you there. I don't know they really said they elected. That's more my position. Not an election, but the idea that I feel that whoever the State intends to claim was the informant is the same person that they would then be bound to prove was unreliable. That's my position.
[PROSECUTOR]: That's your position. So respectfully, with regard to that position, the case law shows that what [sic] we prove the elements of the offense in our indictment and the evidence that we present in support, we're not limited by that. We are only limited to proving the allegations in the indictment.
 As an analogy, if we prove a burglary, unlawful entry could be through a door, through a window, through a chimney. We

charging the jurors, the trial court told them that they had to unanimously agree on the identity of the informant before they could determine whether appellant's statement in the Mendoza search warrant affidavit was false.[3]

### Enrique Alonso and Jose Ruiz

Enrique Alonso was appellant's "main confidential informant." Alonso and appellant first met in July of 1999 after appellant arrested him on narcotics-related charges. Alonso subsequently became a confidential informant for appellant in order to "work off" those charges. After he "worked off" the charges, Alonso continued to operate as a confidential informant for appellant in return for cash payments. Prior to the events which gave rise to the indictment in this case, Alonso was involved in over seventy transactions as a confidential informant for appellant.

Alonso also introduced appellant to other informants, including Roberto Gonzalez, Roberto Santos, Daniel Alonso, Daniel Cavazos, and Jose Ruiz. Appellant used Jose Ruiz, like Alonso, as a confidential informant by allowing him to "work off" a case. After the charges were resolved, Ruiz, like Alonso, continued to serve as a confidential informant in exchange for cash payments. In total, Ruiz was involved in approximately twenty-four transactions as a confidential informant for appellant.

### Jacinto Mejia

In order to prove the confidential informant behind the Jose Mendoza search

---

can provide and supply any of these types of proof in support of our allegation of the unlawful entry.

The prosecutor cited several authorities in support of the State's argument. The discussion then resumed:

THE COURT: Unfortunately, I understand your argument, but I still am having—I don't see where once you start to present your proof, regardless of how it's alleged, right now you're taking a position that there was one individual that provided information. Then you're under—what I think is proposed, you're going to allow the State—or the jury to decide that it could have been someone other than that individual that was unreliable.

[PROSECUTOR]: Our allegation is that we—that the defendant said he was relying on a confidential informant, that the defendant lied when he said he was relying on a confidential informant. The specific—the identity of the confidential informant is not essential to the allegations in the indictment.

THE COURT: That's—I think that's where I'm—that's—I can't get over that. At some point, I mean, the state had offered or suggested that they are relying on the one individual. I mean, that's the way the indictment is, I mean, the tenor of the indictment, and what little on the proof I'm aware of involving the affidavit is specific to one individual.

[PROSECUTOR]: Your Honor, that one individual is not named in the indictment. THE COURT: I know he's not named, but the intent from the State is going to be to offer, the way it's framed, there's no indication it was more than that, there was anything other than one individual that's being referred to.

[PROSECUTOR]: We would again say, you know, going back to the burglary analogy, on an entry you can make the same argument that there was only one method by which a defendant entered the premises, but we might show that he entered either through the door or window.

THE COURT: Okay. Well, I'm still of the opinion that you're bound and once you decide that you're presenting evidence from one individual, that's the individual that you would then be required to prove was unreliable.

The trial court's decision that the State had to prove the identity of the informant is not before us.

3. The jury instruction reads:

To warrant a conviction in this case the jury must unanimously agree upon who the informant was referred to in the indictment, and that the defendant knew said informant was not reliable or had not on each and every occasion in the past proven to be true, reliable, or correct.

warrant was Alonso and not Ruiz and that Alonso was unreliable, the State introduced evidence of six drug arrests made before October 23, 2001, involving Jacinto Mejia, Hugo Rosas, Emigdio Esparza, Daniel Licea, Yvonne Gwyn, and Estanislao Mendoza.

Jacinto Mejia was working at his carburetor repair shop when he was arrested on May 22, 2001. On that day, police officers recovered fifteen packages of a white powdery substance from the back seat of a van parked at Mejia's place of business.

Appellant's arrest report states he and a confidential informant arranged to buy cocaine from Mejia at the carburetor repair shop. The arrest report also states the informant met Mejia at the shop and Mejia handed him two large packages of cocaine. Mejia also allegedly told the informant he had more packages of cocaine hidden in a truck. Mejia testified these statements were not true. Mejia told the jury that after he was jailed, he never saw appellant, and appellant did not question him about the substance that was seized from the van.

All of the packages seized from the van were received at the Southwestern Institute of Forensic Sciences (SWIFS) on August 22, 2001, and laboratory tests were completed on October 5, 2001. According to the laboratory reports from SWIFS,[4] cocaine had been sprinkled between the layers of the wrapping of some packages, while other packages contained no controlled substance. However, the amount of cocaine was "insufficient to quantitate." Nancy Weber, a SWIFS chemist, discovered that most of the powder was gypsum,

also known as pool chalk or "sheetrock."[5] All of the test results in the Mejia case were faxed to the Dallas Police Department on October 9, 2001. Appellant's confidential informant records show that on May 29, 2001, Alonso was paid $20,000 cash in connection with the Mejia case.

*Hugo Rosas*

On June 29, 2001, Hugo Rosas went to a Dallas location seeking day labor. A man approached him offering "good money" for work. Rosas accepted the offer and got into the man's car. They went to a gas station where the man stopped for a few minutes to talk to someone. The man then asked Rosas for assistance in delivering his car to a repair shop. Rosas followed the man's explicit directions in driving the car to the repair shop. When he turned at a designated exit, he was stopped by police. They found fifty-one packages of a powdered substance in the car.

Appellant's arrest report states Rosas met with the confidential informant and Rosas looked in the trunk of the car and said, "It's there. Go ahead and look." Rosas told the jury this statement was not true. Appellant's report also states the informant met with Rosas at Laureland and Interstate 35. Rosas said this never happened. After Rosas was jailed for this offense, appellant never asked him about the arrest or the substance that was found in the car he was driving. Confidential informant records show that on August 2, 2001, Alonso was paid $35,000 cash in connection with the Rosas case.

---

4. The Mejia seizure involved two lab tests. The first was on thirteen packages of purported cocaine with negative findings or amounts "insufficient to quantitate." The second test involved two packages with similar negative findings.

5. Weber said she "coined the word Sheetrock" to describe the substance. Dallas Police Department officers sometimes used the term "sheetrock" in written memoranda, and the State often referred to the substance as "sheetrock" during the trial.

More than fifty kilograms of a powdered substance believed to be cocaine were seized in connection with Rosas's arrest. According to the laboratory report from SWIFS, a total of fifty-one packages were analyzed. The seizure was brought to SWIFS on August 9, 2001, and testing was completed on September 4, 2001. Fourteen of the packages had a thin layer of cocaine near the top of the wrapping, but the amount was "insufficient to quantitate." The other packages did not contain any controlled substance.

The test results were faxed to the Dallas Police Department on September 13, 2001. In early September, Lieutenant Bill Turnage, appellant's supervisor in the Narcotics Division of the Dallas Police Department, told appellant he did not trust Alonso. He asked appellant to "check him out again." Appellant subsequently reported that Alonso "checked out fine." After learning of the negative SWIFS test results in the Rosas case, however, Turnage ordered appellant to stop accepting information from and paying Alonso in drug cases. Turnage also ordered appellant to hand-deliver all large seizures in drug cases to SWIFS for analysis.

### Emigdio Esparza

Emigdio Esparza was arrested on July 19, 2001. Two men in a brown car approached Esparza and offered to pay him "good money" for a painting job. He got into the car with the men. They told him that, before going to the work site, they wanted to go to a convenience store to get another car, which Esparza would drive to the work site. The men left Esparza in this car awaiting the arrival of the job boss. A man later arrived in a white car and asked Esparza if he was ready to go to the work site. The man asked Esparza for the keys to the car Esparza was driving. The man looked inside the trunk, closed it, and then told Esparza to follow him. Within the next ten minutes, Esparza was stopped by the police and placed under arrest. Of sixty-three packages seized from the car and received at SWIFS for analysis on August 9, 2001, one had less than a gram of cocaine; the remaining sixty-two contained no controlled substance. The test results, which were completed on September 20, 2001, were faxed to the Dallas Police Department on October 9, 2001. Appellant's confidential informant records show that, on September 23, 2001, Alonso was paid $50,000 in connection with the Esparza case.

### Daniel Licea

Daniel Licea was arrested on August 7, 2001. On September 17, 2001, appellant personally delivered seventy-one packages of what was believed to be cocaine to the SWIFS laboratory for analysis. Tests were completed on September 26, 2001. The laboratory results, which were faxed to the Dallas Police Department on October 9, 2001, showed no trace of a controlled substance in any of the seventy-one packages.[6]

Appellant's confidential informant records show $26,900 was paid to Alonso for two first-degree felony offenses resulting in the seizure of 76,512.6 grams of what was believed to be cocaine. A total payment of $50,000 was authorized. A handwritten entry on appellant's expense report states: "Total paid is final payment due to analysis of drugs seized." Turnage believed this notation reflected appellant's acknowledgment of his order to stop using Alonso as a confidential informant.

---

6. At appellant's request, the arrest was videotaped by the Dallas Police Department. Appellant was wired for sound when he and the confidential informant met with Licea. The Licea case is sometimes called the "Jack in the Box" case because the initial meeting took place at a Jack in the Box restaurant.

*Yvonne Gwyn*

Yvonne Gwyn was arrested on September 7, 2001, and thirty packages of what was thought to be cocaine were seized and submitted to SWIFS for analysis. On September 14, 2001, one day after the results of the Rosas analysis were faxed to the Dallas Police Department, appellant brought Weber, the SWIFS chemist, one of the packages from the Gwyn seizure for preliminary testing. Weber did a "quick spot test" on the package, which indicated there was a small pocket of cocaine near the top of the wrapping. Three days later, appellant brought her the remaining packages for analysis. On September 28, 2001, Weber completed her testing on the original package and the results showed the presence of some cocaine, but the amount was "insufficient to quantitate." On October 4, 2001, Weber issued her final report on the remaining packages. As before, some of the packages had a thin layer of cocaine sprinkled in the foil lining near the top of the wrapping, but the amount was "insufficient to quantitate."[7] The remaining powder contained no controlled substance. The evidence indicates that appellant used Alonso and Ruiz as confidential informants.

*The SWIFS Reports*

Turnage was not aware of the negative laboratory reports in the Gwyn, Mejia, or Esparza cases, nor was he aware appellant had received these laboratory reports on October 9, 2001. Appellant's knowledge of the SWIFS findings in the Gwyn, Licea, Esparza, and Mejia cases prior to

October 23, 2001 is supported by the testimony of Detective Crista Walker, whose responsibilities at the Narcotics Division of the Dallas Police Department included distributing laboratory reports. She recalled the SWIFS reports in the Gwyn, Licea, Esparza, and Mejia cases were faxed to her office on October 9, 2001, and she was "pretty certain" she delivered these reports to appellant. She recalled having a conversation with appellant about this, asking him, "Hey, you're keeping your lieutenant updated, right?" Appellant responded, "Oh, yeah." Furthermore, Weber recalled she personally talked to appellant about her findings and was in "constant communication" with him about the evidence in the Gwyn, Licea, Esparza, and Mejia cases.

*Estanislao Mendoza*

In early October, shortly after learning of the negative SWIFS findings in the Licea case, Turnage ordered appellant to arrange a polygraph examination for Alonso because he suspected Alonso was "scamming [the department] for money." Alonso passed the polygraph examination on October 12, 2001,[8] but Turnage remained skeptical of Alonso's credibility and again ordered he not be used as a confidential informant. On October 18, 2001, appellant asked Turnage for permission to use Alonso "to do a methamphetamine case." Turnage gave appellant limited authorization to use Alonso with the following restrictions: (1) no arrests; (2) no payment to Alonso; and (3) the seizure

7. Weber analyzed a total of 230 packages in the Mejia, Rosas, Esparza, Licea, and Gwyn cases, and none of them contained measurable amounts of controlled substances.

8. Appellant and Sergeant Jack Gouge, appellant's immediate supervisor, accompanied Alonso to the polygraph examination and observed the test. According to James Gallager, the Dallas Police Department detective who

performed the examination, the focus of the polygraph was on whether Alonso knew the substance seized in the Licea case contained "sheetrock" because that was the only case in which appellant expressed any interest. Appellant told him the polygrapher he did not know Alonso "that well," and he did not mention other cases involving Alonso.

should be taken immediately to the laboratory for analysis.

The target of the investigation, Estanislao Mendoza, was working as a tow truck driver when he was taken into custody on October 18, 2001. Mendoza received a call for towing services and went to a location near Haskell and Peak, in Dallas County, to meet the caller. After Mendoza loaded the car onto his tow truck, he allowed the driver to ride inside the truck cab. The man talked on a cellular telephone while riding with Mendoza. Mendoza traveled a short distance before being stopped by the police. The police arrested Mendoza but allowed the man riding in the truck cab to leave the scene. Police found twenty-five pounds of what they thought was methamphetamine in the towed car.

Appellant's arrest report states that Mendoza was seen opening the door to a red car, removing a package from the back seat, and placing the package inside the towed car. The report also states that Mendoza told the confidential informant he would return the car when he got the money. Mendoza told the jury these statements were untrue. Mendoza also said he had no idea methamphetamine was inside the towed car.

On October 19, 2001, appellant personally delivered one package of what was believed to be methamphetamine from the Mendoza case to Ann Weaver of SWIFS for analysis. A "spot test" on that package showed the presence of methamphetamine, but when the material was fully tested later that day at appellant's request, it was found to actually contain less than one percent methamphetamine.[9] When appellant told Turnage about the test results, Turnage became angry and called Alonso a "dirty MF." He also told appellant, "We're not gonna use him anymore. Don't pay him anymore. Nothing. We're through. Washing our hands of this guy." Appellant responded, "Yes, sir." Appellant, however, continued to use and pay Alonso as a confidential informant.

*Jose Mendoza*

On October 19, 2001, Turnage left his position in the Narcotics Division after being appointed deputy chief. Lieutenant Craig Miller assumed Turnage's supervisory responsibilities in the Narcotics Division. When Miller learned Alonso had taken a polygraph examination, Miller told Sergeant Jack Gouge, appellant's immediate supervisor, to stop using Alonso as an informant "for a while." Miller did not know Turnage had already issued a similar order. Nevertheless, when reviewing the October expense reports, Miller noticed Alonso received a payment of $500 on October 25, 2001, for a search warrant executed at 5972 Marine Way on October 23, 2001.[10]

The affidavit for that search warrant was presented to City of Dallas Municipal Court Judge Victor Lander on October 22, 2001, and reads as follows:

1. There is in Dallas County, Texas, a suspected place and premises described and located as follows: A residence white in color with yellow trim and located at 5972 Marine Way, in the City of Dallas, Dallas County, Texas.

---

9. Weaver was later given twenty-four other packages from the Mendoza case for analysis. Those tests were completed by November 14, 2001, and also showed no measurable amounts of controlled substances.

10. When Miller asked Gouge about the payment to Alonso, Gouge told him appellant thought Alonso could still be used for "small deals or [to] check locations." Miller also explained his signature was not required for approval of the $500 payment to Alonso because sergeants could independently approve payments of up to $500.

2. There is at said suspected place and premises personal property concealed and kept in violation of the laws of Texas and described as follows: A CONTROLLED SUBSTANCE: TO WIT: Methamphetamine.

3. Said suspected place and premises are in charge of and controlled by each of the following persons: A Hispanic male approximately 60 years old, 5′7″ tall, 160 pounds and is known as Jose Mendoza and person or persons whose names, ages, and descriptions are unknown to Affiant.

4. It is the belief of Affiant, and he hereby charges and accuses, that: The described Hispanic male and or persons whose names, ages and descriptions are unknown to the affiant did on the 22nd day of October, 2001 possess a controlled substance to wit: Methamphetamine, in the city of Dallas, Dallas County, Texas.

5. Affiant has probable cause for said belief by reason of the following facts: Affiant, M.A. DeLaPaz # 6378, is employed by the City of Dallas Police Department and is currently assigned to the Narcotics Division.

I, the Affiant, received information from a reliable and confidential informant who stated that drugs were being stored and sold from 5972 Marine Way. The informant went to the location on the 22nd day of October, 2001 and observed the described Hispanic male in paragraph # 3 in possession of and selling methamphetamine from the residence located at 5972 Marine Way, in the City of Dallas, Dallas County, Texas.

I, the Affiant, received this information from the informant on the 22nd day of October, 2001.

I, the Affiant, have received information in the past from said confidential and reliable informant about persons who traffic in drugs in the Dallas County area and on each and every occasion, said confidential informant was proven to be true, reliable, and correct. This informant is familiar with methamphetamine and its various forms and appearances.

Wherefore, Affiant asks for the issuance of a warrant that will authorize him to search said suspected place and premises for said personal property and seize the same and to arrest each said described and accused person.

After appellant swore that the information in the affidavit was true and correct, Judge Lander signed the search warrant.

Documentary evidence shows that both Alonso and Ruiz were paid in connection with the Jose Mendoza search warrant. On October 25, 2001, two days after the search warrant was executed, appellant submitted a $500 payment receipt for Alonso with the following notation: "5972 Marine Way—Search Warrant seized $4,661.00 currency and 4 guns on 10–23–01."[11] The confidential informant expense report for Alonso also indicates a payment of $500 on October 25, 2001, for the reason "SW."[12] The record also contains a payment receipt for $100 dated October 22, 2001, to Jose Ruiz with the notation: "C/B 5972 Marine Way—244.3 g. meth." The confidential informant expense report for Ruiz contains an entry indicating Ruiz was

11. Before it was shown to the jury, the payment receipt was redacted, over defense counsel's objection, to read "5972 Marine Way–Search Warrant on 10–23–01." References to the seized guns and cash were deleted.

12. Over defense counsel's objection, a reference to "4661.00 cash and 4 guns" in the expense report was redacted.

paid $100 on October 22, 2001, for the reason "CB." A "Drug Buy Report" also reflects Ruiz's purchase of 122.1 grams of methamphetamine from Jose Mendoza on October 22, 2001. A "CI Payment Summary" shows that a $100 payment was made to Ruiz on October 21, 2001, for "Making C/Buy(s) and/or Checking Complaint(s)." The next line reads: "612 8TH–1/2 POUND METH." The "CI Payment Summary" also shows that Alonso received $500 on October 25th for "Results of Operation(s) Conducted." The next line reads: "SEIZED 4661.00 CURRENCY AND 4 GUNS on 10–23." [13]

In addition to the documentary evidence, telephone records show that on October 22, 2001, the date of the controlled drug buy at Mendoza's residence, seventeen telephone calls between Alonso and appellant were made; one telephone call to Ruiz's phone was made. The next day, when the search warrant was executed, phone records show fourteen calls between appellant and Alonso and two calls to Ruiz's phone number. Twenty minutes before the issuance of the search warrant, there was one telephone call from appellant to Alonso; there were no telephone calls to Ruiz. [14]

The State elicited testimony from a number of witnesses who testified, based on their review of the evidence, that Alonso was the confidential informant in the Jose Mendoza search warrant affidavit. Miller and Turnage rejected defense counsel's suggestion that the documentary evidence pointed to Ruiz as the confidential informant. Both men believed Ruiz was paid only for a "controlled buy" of methamphetamine at Jose Mendoza's residence on October 22, 2001, while Alonso was the confidential informant referred to in the October 23rd search warrant affidavit. Turnage explained that a "controlled buy" was not the same thing as a payment for a search warrant. He also rejected defense counsel's suggestion that the payment to Alonso was for an "introduction" [15] because there was no mention of an introduction in the confidential informant records. Sergeant Jeoff Williams, the Texas Department of Public Safety (DPS) officer who reviewed appellant's files in the Rosas, Mejia, Esparza, Gwyn, and Licea cases, and Sergeant David Eldridge, the DPS officer who analyzed appellant's telephone records, also believed Alonso was the confidential informant. In addition, several of the State's witnesses said they would not have signed a search warrant affidavit

---

13. When this document was shown to the jury, the reference to seized currency and guns was redacted. The redacted version of the document states the following reason for the payment: "Results of Operation(s) Conducted on 10–23." The trial court's redactions in the confidential informant payment records form the basis for appellant's fifth issue.

14. There was a pattern of calls made between appellant and his confidential informants when an arrest and seizure was about to occur. In the Rosas case, the telephone records showed twenty-five calls between appellant and Alonso; there were sixteen calls between Alonso and Ruiz. In the Esparza case, there were sixteen calls from appellant to

Alonso, nine calls from Alonso to appellant, and no calls between Alonso and Ruiz. In the Licea case, there were seven calls from Alonso to appellant, one call from Ruiz to appellant, and thirty-three calls from appellant to Alonso. In the Gwyn case, there were twenty-two calls from appellant to Alonso, six calls between appellant and Ruiz, and thirty-one calls between Ruiz and Alonso.

15. An "introduction" typically involves the confidential informant introducing another confidential informant or an officer to the target of the investigation in order to facilitate an undercover buy. Standard operating procedures for the Dallas Police Department allowed for "introduction payments" to informants of up to $500.

which was based on information from Alonso as a confidential informant.[16]

*The FBI Investigation*

Prior to the indictment in this case, a six-count federal indictment was brought against appellant based upon false statements he allegedly made in police reports and to the Federal Bureau of Investigation (FBI). He was subsequently acquitted of the charges. During the course of the FBI's investigation, Special Agent Marjorie Poche interviewed appellant, Alonso, and Ruiz.

When Poche interviewed appellant on June 19, 2002, six months after the so-called "fake drug" scandal first became public knowledge, appellant told Poche that Alonso started working as a confidential informant for him in July 1999. This was more than two years before appellant prepared and presented the Jose Mendoza search warrant affidavit. Appellant told Poche that money to pay confidential informants in drug operations was cut off because of the negative laboratory results in the Licea case. Appellant also told Poche that, because of the Licea case, he became concerned about the presence of "fake drugs" in his undercover operations and went personally to SWIFS to speak to Weber. When appellant spoke to Weber on September 12, 2001, she told him his other drug cases had resulted in "either no narcotic[s] present or too little to quantitate."

Poche interviewed Alonso on January 28, 2003, while he was incarcerated in a federal prison. Alonso told Poche that he knew Jose Mendoza but was initially "reluctant" to do a drug deal for appellant at Mendoza's residence.[17] Alonso also explained how Mendoza was "set up." Alonso told her that two other confidential informants, Jose Ruiz and Roberto Gonzales, went to 5972 Marine Way on October 23, 2001, and asked to take a Crown Victoria that was for sale for a "test drive." Ruiz and Gonzalez then drove the car from the Mendoza residence to a location about three blocks away, where Alonso was waiting. Once there, the three of them loaded the car with packages of "fake methamphetamine." Ruiz and Gonzalez then returned the Crown Victoria to the Mendoza residence and parked the car on the property. Alonso did not accompany Ruiz and Gonzalez to the Mendoza residence,[18] but Alonso later met with appellant and told him "that drugs were stored under a rug in a closet."

After Mendoza was arrested and the search warrant was executed, police found drugs and $6000 cash hidden in a closet of the residence. Alonso told Poche he was paid only $500 for the arrest and the information that led to the search warrant "because the methamphetamine turned out to be fake." Appellant told Alonso to consider the $500 a "loan" because the information Alonso gave him resulted "in a search warrant with methamphetamine that was fake." There was "no doubt" in Poche's

16. In Eldridge's opinion, Alonso and Ruiz were both "corrupt to the core."

17. Alonso actually told Poche he was reluctant to do a drug deal with Mendoza because he suspected Mendoza had killed a man, but the trial court did not permit defense counsel to ask Poche why Alonso feared Mendoza. Poche's testimony before the jury was limited to Alonso's "reluctance" to deal with Mendoza. In his sixth issue, appellant attacks the

trial court's decision to limit the scope of Poche's testimony.

18. During his interview with Poche, Ruiz recalled purchasing one-half pound of methamphetamine for between $2500 and $2800 at the Mendoza residence on October 22, 2001. According to Poche, "[b]oth Mr. Ruiz and Mr. Alonso said Mr. Ruiz was the one who went to the location at 5972 Marine Way."

mind that Alonso claimed he was the confidential informant who was paid for the Mendoza search warrant.

## APPELLANT'S ISSUES

Appellant brings eight issues in this appeal. In his first issue, appellant argues the Dallas County Criminal District Attorney improperly appointed a special prosecutor for the investigation and trial of this case, and the special prosecutor was not authorized to represent the State of Texas at trial. In his second issue, appellant argues the State improperly charged him with an additional offense by amending the indictment to allege the "unnamed confidential informant" referred to in the search warrant affidavit was either Alonso or Ruiz. In his third issue, appellant claims that after the trial court granted leave to amend, it erred in denying his request for a severance because the State was charging him with two offenses by adding the two named informants to the indictment. Appellant's fourth issue contends the trial court erred in allowing the State to arraign him on the amended indictment because it was never properly filed. In his fifth issue, appellant alleges there was "no basis" for the trial court to refuse to allow the jury to hear that guns and money were seized in the raid on Jose Mendoza's residence. In his sixth issue, appellant argues the trial court erred by allowing testimony that Alonso was "reluctant" to deal with Jose Mendoza while prohibiting more specific testimony that Alonso was afraid to deal with Mendoza because he suspected Mendoza had killed a man. In his seventh issue, appellant argues the jury was erroneously instructed in the court's charge to assume the truth of one of the State's allegations. Appellant's eighth issue asks us to review records that the trial judge reviewed *in camera* and then ordered sealed.

## DISCUSSION

### Special Prosecutor Appointment

In his first issue, which concerns the trial court's denial of appellant's motion to set aside indictments, appellant questions "[w]hether a District Attorney can appoint what in essence is a *de facto* Attorney Pro Tem," in violation of article 2.07 of the Texas Code of Criminal Procedure, "and thereby give up responsibility for the prosecution, control and management of the case at issue." Before addressing the merits of this claim, we must determine whether it is preserved for appellate review. To preserve a complaint for appellate review, a party must make a timely, specific objection in the trial court. TEX. R.APP. P. 33.1. In addition, the complaint on appeal must comport with the objection at trial. *Swain v. State*, 181 S.W.3d 359, 367 (Tex.Crim.App.2005); *Rice v. State*, 195 S.W.3d 876, 882 (Tex.App.-Dallas 2006, pet. ref'd).

On appeal, appellant argues the "special prosecutor" was acting as an attorney pro tem and not as a special prosecutor. An attorney pro tem is appointed by the trial court when the district attorney is unable to appear in the case because (1) he is disqualified to act in the case, (2) absent from the county or district, (3) unable to perform the duties of his office, or (4) in any instance where there is no attorney for the State. TEX.CODE CRIM. PROC. ANN. art. 2.07(a) (Vernon 2005). The attorney pro tem acts independently of the district attorney, who has no right to supervise or control the attorney pro tem. A special prosecutor, on the other hand, is appointed by the district attorney to prosecute a particular case and is under the supervision and control of the district attorney. *See State v. Rosenbaum*, 852 S.W.2d 525, 529 (Tex.Crim.App.1993) (Clinton, J., con-

curring);[19] *see also Mai v. State*, 189 S.W.3d 316, 319 (Tex.App.-Fort Worth 2006, pet. ref'd) ("When a special prosecutor is appointed, the district attorney remains primarily responsible for the prosecution, control, and management of the case.").

In this case, then Dallas County District Attorney Bill Hill deputized Daniel Hagood, who took the oath of an assistant district attorney. In a letter memorializing their previous conversations concerning Hagood's appointment, Hill stated,

> As we have discussed, I intend to appoint you as a Special Prosecutor in order to investigate and if the evidence warrants, prosecute Mark Delapaz for criminal violations of Texas State Law in connection with Mr. Delapaz's involvement in the drug cases commonly referred to as the "fake drug" cases. As Special Prosecutor, you will have complete authority to investigate and prosecute Mr. Delapaz for any crimes he may have committed in connection with the fake drug cases and will have the complete cooperation of this office as you conduct your investigation before the Dallas County Grand Jury.

> To aid you in the investigation and prosecution of any cases that may be brought against Mr. Delapaz, I have requested the assignment of a narcotics officer from the Texas Department of Public Safety to work under your direction.

> Although you will be appointed by me, *you will be independent of my office and will report to no one in this office,*

*including me.* Administrative issues related to pay, office space, expense reimbursement, etc., will be dealt with through separate correspondence. All prosecutorial decisions that you make will be yours to make consistent with the law and the scope of this appointment.

(emphasis added.)

Appellant argues the language italicized above made Hagood a de facto attorney pro tem and not a special prosecutor or assistant district attorney. Appellant then asserts that because Hagood was not appointed by the trial court as required by article 2.07, Hagood was not a legal attorney pro tem. Therefore, appellant concludes, "because Hagood was left in a no-man's land between Special Prosecutor and Attorney Pro Tem the result was that the indictment in this case was procured by a person not authorized by law to be present before the grand jury." Thus, appellant asserts, the trial court erred in denying appellant's motion to set aside the indictments. Appellant does not assert the indictments were void or that the trial court lacked jurisdiction over the case.

The argument presented on appeal, that Hagood was independent of the district attorney making him a de facto attorney pro tem, was not presented at trial. Appellant argued at trial that "[u]nder [a]rticle 2.07 ... the court should have made the appointment of an independent 'attorney pro tem,'" but Hagood was not an attorney pro tem because the district attorney controlled and directed the prosecution. In his reply brief to the trial court on this issue, appellant stated,

---

19. Judge Clinton described the two positions thus:

> Basically, a "district attorney pro tem" is appointed by the district court, and after taking the oath of office assumes the duties of the elected district attorney and in effect replaces the latter in performing germane functions of office for purposes contemplated by the appointment. On the other hand, a "special prosecutor" is permitted by the elected district attorney to participate in a particular case to the extent allowed by the prosecuting attorney....

*Rosenbaum,* 852 S.W.2d at 529.

Although it would have been easy to ask the Court to appoint an independent attorney pro tem, the District Attorney appointed a "special prosecutor" *who was and is subject to the control of the District Attorney* ...

*The District Attorney has also consistently acted to maintain control of this prosecution* by stubbornly refusing to recuse himself and his office. The only possible reason for this position is that the District Attorney wants to control the prosecution for self-interested reasons.

\* \* \*

... [T]he District Attorney's extrajudicial pre-investigation statements regarding Mr. De la Paz's [sic] alleged guilt were direct breaches of a prosecutor's ethical duties, as well as explicit instructions to the "special prosecutor" on how his investigation should proceed. *The District Attorney, therefore, demonstrated that he was no longer functioning as a disinterested prosecutor and was, instead, directing and shaping an investigation* ....

\* \* \*

The State contends that the DA's Office's appointment of a special prosecutor brought independence to the investigation and prosecution of Mr. De la Paz [sic]. However, the facts demonstrate otherwise....

In this case, the District Attorney's Office refused to recuse itself, instead opting to appoint a special prosecutor to assist it in the investigation of Mr. De la

Paz [sic]. *Thus, the special prosecutor serves at the pleasure of and under the control of the District Attorney's Office, who directs the investigation and prosecution of Mr. De la Paz....*

From the outset, despite the wide-ranging scope of the "fake drug" scandal, the District Attorney's Office *directed the "special prosecutor" to conduct* an outcome-oriented investigation focused on the investigation and prosecution of a single individual....

(emphasis added.)

■ Clearly, appellant's argument at trial was that Hagood was appointed as a special prosecutor under the direction and control of the district attorney, not that he was a de facto attorney pro tem acting independently of the district attorney. Appellant's argument on appeal does not comport with his objection at trial. Accordingly, he has failed to preserve error on this issue. *Swain,* 181 S.W.3d at 367; *Rice,* 195 S.W.3d at 882.[20]

Appellant also asserts the trial court should have granted him an evidentiary hearing on his motion to quash the indictments. However, he presents no argument and cites no authority in support of this assertion. Accordingly, he has waived this complaint on appeal. *Stahle v. State,* 970 S.W.2d 682, 692 (Tex.App.-Dallas 1998, pet. ref'd).

■ Appellant also argues that as a result of the Dallas County District Attorney's "unlawful attempt to appoint Hagood as a de facto Attorney Pro Tem, there was a clear violation of the Separation of Pow-

---

**20.** In a written pretrial motion, appellant argued the district attorney was disqualified to prosecute appellant because of alleged conflicts of interest and, therefore, he could not appoint a special prosecutor in this case. In his brief on appeal, appellant briefly referred to alleged conflicts of interest on appeal; however, he did not present argument or authority in support of his assertion the District Attorney's disqualification and lack of authority to appoint a special prosecutor, and therefore, he has not properly briefed it. Tex. R.App. P. 38.1(h); *Russeau v. State,* 171 S.W.3d 871, 881 (Tex.Crim.App.2005).

ers clause of the Texas Constitution set forth in Article 2, § 1." Appellant claims that because article 2.07 required the appointment of an attorney pro tem as opposed to a special prosecutor, the Dallas County District Attorney's "end run around the Attorney Pro Tem procedure resulted in the executive branch of government interfering with the powers delegated to the judicial branch under Art. 2.07."

The Texas Court of Criminal Appeals has recognized that separation of powers may be violated in either of two ways: "(1) 'when one branch of government assumes, or is delegated, to whatever degree, a power that is more "properly attached" to another branch,' and (2) 'when one branch unduly interferes with another branch so that the other branch cannot effectively exercise its constitutionally assigned powers.'" *State v. Williams,* 938 S.W.2d 456, 458 (Tex.Crim.App.1997) (quoting *Armadillo Bail Bonds v. State,* 802 S.W.2d 237, 239 (Tex.Crim.App.1990)). "The first type of violation has to do with a usurpation of one branch's powers by another branch. The second type has to do with the frustration or delay of one branch's powers by another branch." *Rushing v. State,* 50 S.W.3d 715, 723 (Tex.App.-Waco 2001), *aff'd,* 85 S.W.3d 283 (Tex.Crim.App.2002).

■ We conclude appellant's separation of powers claim is without foundation because there is no indication the Dallas County District Attorney exceeded his constitutional or statutory authority. The responsibility for acknowledging the need for an attorney pro tem lies with the district attorney, and the trial court may not impose it. *See Marbut v. State,* 76 S.W.3d 742, 748 (Tex.App.-Waco 2002, pet. ref'd) (citing *State ex rel. Eidson v. Edwards,* 793 S.W.2d 1, 5–7 (Tex.Crim.App.1990) (op. on reh'g)). The record does not indicate the Dallas County District Attorney was absent from the district, disqualified,

or for any other reason unable to perform the duties of his office. *See* Tex.Code Crim. Proc. Ann. art. 2.07(a). Nor does the record indicate the Dallas County District Attorney, although not disqualified to act, for good cause shown, was permitted by the trial court to recuse himself from this case. *See id.* art. 2.07(b–1). None of the requirements for the appointment of an attorney pro tem under article 2.07 are found in this record. Because the Dallas County District Attorney had no constitutional, statutory, or professional obligation to seek his disqualification from this case, he had the discretion to choose a special prosecutor to assist him in the investigation and prosecution of appellant. *See Stephens v. State,* 978 S.W.2d 728, 731 (Tex. App.-Austin 1998, pet. ref'd) (utilization of special prosecutor is not predicated on absence or disqualification of elected district attorney). Therefore, the Dallas County District Attorney's failure to seek approval of the trial court before appointing Hagood as special prosecutor did not constitute interference with another branch of government under article two, section one of the Texas Constitution. Appellant's first issue is overruled.

## The Redacted Documents

*Background*

As previously noted, the identity of the confidential informant was one of the major issues in this case. The indictment against appellant alleged he obtained the Mendoza search warrant on October 23, 2001 based on an affidavit in which he falsely asserted he "had received information in the past from the said confidential and reliable informant ... and on each and every" occasion, the confidential informant had proven "to be true, reliable and correct." Like the indictment, the Mendoza search warrant affidavit refers to the reliability of and information provided by a

single confidential informant, i.e., the informant who "went to the location on the 22nd day of October, 2001 and observed [Mendoza] in possession of and selling methamphetamine." Thus, the focus of this trial was on whether appellant knew he was making a false statement about the reliability of a confidential informant who supplied the information necessary to obtain the October 23, 2001 search warrant.

The prosecution's strategy was to show the confidential informant referenced in the affidavit was Alonso; the defense's strategy was to show the confidential informant was Ruiz.[21] The documents relating to surveillance of Mendoza's residence on October 22 and 23, 2001 show Ruiz was paid $100 for performing a controlled buy of methamphetamine on October 22nd, and Alonso was paid $500 for "search warrant" or "SW" resulting in the seizure of money and guns. The references to the money and guns seized were redacted from those documents.

Even before opening statements were made, the defense argued it should be allowed to inform the jurors of the guns and cash found during the raid on Mendoza's residence. The references to guns and cash are found in the three confidential informant payment records documenting the October 25th $500 payment to Alonso.[22] Whether this information should have been disclosed to the jury was the subject of lengthy discussion between defense counsel and the trial court. The court ultimately determined the results of the search were not an issue in the trial. Therefore, references to guns and cash in the confidential informant documents were removed before those documents were shown to the jury. The defense asserted the references to the guns and money

would tend to show Alonso was paid not for providing the information supporting the search warrant affidavit, but for introducing Ruiz to Mendoza, who performed the controlled buy. The defense concluded it had to be Ruiz, and not Alonso, who was the confidential informant referenced in appellant's affidavit.

The record contains the following discussion between defense counsel and the trial court:

[DEFENSE COUNSEL:] Okay, Your Honor. Two other matters quickly. The court has not ruled, to begin with, if the identity of the confidential informant is gonna be an issue, we're entitled to go into what was found at Jose Mendoza's residence on October 23rd, 2001. Mr. Alonso was paid $500 on October 25th.

THE COURT: They alleged either one of those. Unless there is—

[DEFENSE COUNSEL:] We're entitled to prove it's Ruiz and not Alonso. We need to go into the contents what [sic] was found in the safe: the guns and cash.

THE COURT: I'm going to overrule that at this point. I don't think the contents are in issue. The fact they were paid is admissible. What was found, I don't believe it is.

[DEFENSE COUNSEL:] But, Your Honor, what was found relates to why they were paid. We're not only entitled to show Ruiz and Alonso were paid, but why they were paid. The only way the jurors will understand why Enrique Alonso got $500 is by finding out what was found on the search warrant: $4,600 in cash, two shotguns, two handguns, real

---

21. In his opening statement, defense counsel stated Ruiz had been involved in fake methamphetamine cases.

22. *See supra* footnotes 11–13 and accompanying text.

meth, real coke, digital scales, baggies. Baggies put together, Your Honor, for individual sale. Baggies of meth, baggies of coke.

If they're going to go into payments to either one of the confidential informants, we're entitled to show why that was done. The jury has to know what was found on October 23rd, 2001.

THE COURT: I disagree. You're trying to prove the same thing the State is here. What you're arguing here is that they were both involved.

[DEFENSE COUNSEL:] No, Your Honor, we're trying to argue that Jose Ruiz is the only confidential informant referred to in the affidavit. That's our position. That's our position to the jury. The state's trying to ride two horses, Your Honor. We're entitled to show why Enrique Alonso was paid and we couldn't do that unless you let us get into what was found in the search.

[DEFENSE CO–COUNSEL:] The reason is the search warrant affidavit refers to information from a singular person who went there that day. Enrique Alonso did not go there that day. He was paid. The explanation was he was paid a finder's fee for the guns and money. Jose Ruiz was paid for going there. We need to explain why the two payments were made, what they were made for, in order to show it was actually Ruiz. The whole reason the State's decided they wanted to switch to the either/or approach[23] is because they want to take the position it was Enrique Alonso or they want the jury to consider the reliability of Enrique Alonso. We want to focus them on reliability of Jose Ruiz.

We want to tell the jury, "You don't need to consider Enrique Alonso." That's not what he's talking about. He's talking about Jose Ruiz. To do that, we need to be able to say Jose Ruiz got paid $100 for being the one who went there. The payment to Enrique Alonso was not for going in there. He was paid a finder's fee for guns and cash found there. These [sic] why we have to explain it.

**23.** At this point in the proceedings, as reflected by defense counsel's comments about "riding two horses" and the State using an "either/or approach," the parties expected to proceed on an amended indictment alleging that the "unnamed confidential informant" referred to in the search warrant affidavit was either Alonso or Ruiz.

In his second, third, and fourth issues, appellant argues the trial court erred by permitting the indictment to be amended. According to the record, the State requested permission to amend the indictment after the trial court informed the State in a pretrial conference that it would require the State to prove the identity of the informant referred to in the search warrant affidavit. On March 14, 2005, the first day of trial, appellant was arraigned on the amended indictment. After the jurors were brought into the courtroom and sworn, the amended indictment was read to the jury. However, a recess was called following a bench conference between the trial judge and counsel that was not tran-scribed, after which the trial judge instructed the State to arraign appellant a second time. This second arraignment tracked the language of the original indictment. Appellant entered a plea of not guilty to the original indictment. Shortly thereafter, the jurors were brought into the courtroom and instructed to disregard the amended indictment that was previously read to them. The original indictment was read to the jury and appellant entered his plea to the original indictment in the presence of the jury. After the presentation of the evidence, the jury was instructed using the language of the original unamended indictment.

Based on these facts, the State contends the original indictment is the indictment of record. In his reply brief, appellant concedes this point and acknowledges that the trial was ultimately conducted based on the original indictment. He also withdraws his second, third, and fourth issues. Consequently, we do not address those issues.

THE COURT: Again, I'm gonna limit you. I don't want to go into what was found in the arguments. I'm gonna be willing to consider further arguments. I don't think for opening arguments—I don't want you to go into that issue. During subsequent discussions about the scope of FBI agent Poche's testimony, the trial court reiterated its ruling that what was seized at Mendoza's residence was not admissible: "What was seized at the arrest, at the search, I have ruled earlier that was not admissible at this point."

### The Redactions

The original Narcotics Division payment sheet states appellant paid Alonso $500 on October 25, 2001, for the following reason: "5972 Marine Way—Search Warrant seized $4,661.00 currency and 4 guns on 10–23–01." The redacted version of the document which was shown to the jury reads: "5972 Marine Way–Search Warrant on 10–23–01."

The "Confidential Summary," an expense report prepared by appellant, indicates Alonso was paid $500 on October 25, 2001, for the "reason" "SW." Under "results," the table contains the following notation: "4661.00 cash 4 guns." The redacted version of the document omits the reference to cash and guns.

The "CI Payment Summary" states Alonso received $500 on October 25, 2001 for "results of Operation(s) Conducted SEIZED 4661.00 CURRENCY AND 4 GUNS ON 10–23." The redacted version of the document states the following reason for the payment: "Results of Operation(s) Conducted on 10–23."

### Appellant's Issue

In his fifth issue, appellant argues there was "no basis" for the trial court's refusal to allow the jury to hear that guns and money were seized in the raid on the Mendoza residence. Appellant argued in the trial court, as he does on appeal, this information was highly relevant and probative because it supported his defensive theory that Alonso was paid $500 for the recovery of cash and guns resulting from introducing Ruiz to Mendoza, while Ruiz was paid for actually going to the residence. Therefore, Ruiz, not Alonso, was the confidential informant behind the Mendoza search warrant affidavit. Appellant claims it is "completely unclear" why the trial court did not allow this information to be presented to the jury under the rule of optional completeness.

### Standard of Review

█ We review a trial court's decision to exclude evidence under an abuse of discretion standard. *See Salazar v. State,* 38 S.W.3d 141, 153–54 (Tex.Crim.App. 2001). We will not reverse a trial court's ruling concerning the admission of evidence unless that ruling falls outside the zone of reasonable disagreement. *Id.*

### The Rule of Optional Completeness

Rule 106 of the Texas Rules of Evidence provides: "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may at that time introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." TEX.R. EVID. 106. Similarly, rule 107 provides:

When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence, as when a letter is read, all letters on the same

subject between the same parties may be given.

TEX.R. EVID. 107; *Wright v. State,* 28 S.W.3d 526, 535–36 (Tex.Crim.App.2000); *Gutierrez v. State,* 85 S.W.3d 446, 456 (Tex.App.-Austin 2002, pet. ref'd). "These principles comprise the rule of optional completeness, which was designed to 'guard against the possibility of confusion, distortion, or false impression that could rise from [the] use of an act, writing, conversation, declaration, or transaction out of proper context.'" *Elmore v. State,* 116 S.W.3d 801, 807 (Tex.App.-Ft. Worth 2003, pet. ref'd) (quoting *Livingston v. State,* 739 S.W.2d 311, 331 (Tex.Crim.App.1987)).

*Harm Analysis*

■ In the present case, we need not explore the defense's theories of admissibility for the complete payment receipts because we conclude the error, if any, committed by the trial court in overruling the defense's objections was harmless. Therefore, for purposes of analysis, we will assume error and address appellant's contention that the error was harmful.

■ The erroneous exclusion of a defendant's evidence generally constitutes non-constitutional error unless the excluded "evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Potier v. State,* 68 S.W.3d 657, 665 (Tex. Crim.App.2002). In this case, although the excluded evidence was relevant to appellant's defensive theory, we conclude its exclusion did not prevent him "from presenting the substance of his defense to the jury." *Id.* at 666. Therefore, we apply the harmless error standard of rule 44.2(b) of the Texas Rules of Appellate Procedure.

■ Rule 44.2(b) provides that any non-constitutional error which does not affect substantial rights must be disregarded. *See* TEX.R.APP. P. 44.2(b). Substantial rights are not affected by the erroneous admission or exclusion of evidence "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Motilla v. State,* 78 S.W.3d 352, 355 (Tex.Crim.App.2002). However, if the reviewing court harbors "grave doubts" that an error did not affect the outcome, the court must treat the error as if it did. *Webb v. State,* 36 S.W.3d 164, 182 (Tex.App.-Houston [14th Dist.] 2000, pet. ref'd).

■ In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla,* 78 S.W.3d at 355. The presence of overwhelming evidence supporting the conviction can be a factor in the evaluation of harmless error. *Id.* at 356–58 (assessing effect of erroneously admitted evidence); *see also Morales v. State,* 32 S.W.3d 862, 867 (Tex.Crim.App.2000) ("The fact that a piece of evidence was wrongfully excluded from the jury's consideration is not sufficient to warrant reversal of a conviction unless the exclusion had a 'substantial and injurious effect or influence in determining the jury's verdict.'"). Neither party has the burden to prove harm from an error. *Johnson v. State,* 43 S.W.3d 1, 4 (Tex. Crim.App.2001). It is the duty of the reviewing court to assess harm from the context of the error. *Id.*

We begin with the excluded evidence and the defensive strategy involving it. The defense stated it would use the redacted evidence of recovered guns and money

to show Alonso was not paid for providing the search warrant information but was paid only for introducing Ruiz to Mendoza. The defense stated it would then show the confidential informant who provided the information was Ruiz and not Alonso. But even if the documents were not redacted and the evidence had been admitted, this defensive strategy is simply speculation. First, the Narcotics Division payment sheet and the confidential summary show Alonso was paid for the search warrant (or "SW" on the confidential summary), and nothing, including the redactions, shows Alonso was paid for an introduction only. Neither of the witnesses called by the defense during the guilt-innocence portion of the trial, Mark Rangel, appellant's former partner, and Jack Gouge, the former sergeant in charge of the narcotics unit to which appellant was assigned,[24] testified that Ruiz was the confidential informant. Second, even if Alonso did introduce Ruiz to Mendoza, the defense never explained why that introduction did not take place on October 22nd when Ruiz made the controlled buy. Alonso could have introduced Ruiz to Mendoza and could have observed Mendoza in possession of drugs and selling drugs, which would have been consistent with Alonso being the confidential informant referenced in appellant's affidavit. After considering appellant's proposed use of the excluded evidence, we have a fair assurance the exclusion of the evidence had at most only a slight affect, and we do not have "grave doubts" that its exclusion affected the outcome of the case. *See Motilla*, 78 S.W.3d at 355; *Webb*, 36 S.W.3d at 182.

We next consider the evidence admitted at trial and the nature of the evidence supporting the verdict, including whether this evidence was overwhelming. At trial, the State presented a significant amount of direct and circumstantial evidence indicating Alonso was the confidential informant behind the Mendoza search warrant affidavit. Poche testified Alonso told her he was paid for the search warrant. Williams testified that based on his review of the documents in this case, appellant was referring to Alonso in the October 23rd affidavit. Eldridge also conducted a review of the records of appellant's undercover drug operations and concluded Alonso was paid as the informant behind the search warrant. In addition to the testimony of these witnesses, Turnage, appellant's former supervisor, concluded the records showed Alonso was paid for the warrant and was the informant referred to in the search warrant affidavit. Miller, another former supervisor, agreed with this assessment. The jury also heard that prior to the controlled buy at Mendoza's residence, there were seventeen telephone calls between Alonso and appellant, but only one call to Ruiz. On the day the warrant was issued, fourteen calls were made from appellant's cell phone to Alonso, one of which was made twenty minutes before the warrant was issued. Based on the frequency and volume of these contacts, the jury could reasonably infer Alonso was providing appellant with information concerning the Mendoza search warrant. We conclude the jury's verdict is supported by overwhelming evidence.

Another relevant factor in our harm analysis is "the character of the alleged

---

24. Gouge testified for the defense under a grant of immunity that he believed both Alonso and Ruiz were reliable on the date appellant made and presented the search warrant affidavit. On cross-examination, he admitted he testified to the grand jury that appellant made a false statement in the affidavit. He also admitted telling the grand jury that on October 23, 2001, he knew the informant referred to in the search warrant had not proven to be correct on each and every occasion in the past.

error and how it might be considered in connection with other evidence in the case." *Morales*, 32 S.W.3d at 867. As noted previously, the jury charge required the jurors to agree unanimously on the identity of the confidential informant before they could determine whether appellant's statement in the search warrant affidavit was false.[25] Appellant argues that given the importance of the confidential informant's identity to the State's case, the redacted information was highly relevant because it tended to support his theory that Ruiz, not Alonso, was the confidential informant behind the search warrant affidavit. But the charge did not mention the names of any confidential informants and did not ask the jurors to determine whether Alonso was the confidential informant—it only required them to agree on the informant's identity. Starting from when the trial judge first read the amended indictment, the names and confidential informant numbers[26] of both Alonso and Ruiz were mentioned throughout the trial. There was evidence appellant had a long-standing relationship with Ruiz as a confidential informant, and Ruiz and Alonso worked closely together in making "controlled buys" of narcotics for appellant. Among the many documents introduced for the jury's consideration, the record includes copies of drug buy reports from Ruiz's confidential informant file that show Ruiz made "controlled buys" of narcotics for appellant on September 18 and 24, 2001, at 5500 E. Grand Avenue and 1645 Forth Worth Avenue, in Dallas, Texas.[27]

Furthermore, Poche testified appellant told her Ruiz was the confidential informant who made the "controlled buy" of what was believed to be cocaine from Yvonne Gwyn on September 7, 2001. There was also evidence Ruiz was an informant in the Estanislao Mendoza case. The jury also heard testimony that Ruiz was just as "bad" as Alonso. When asked about Ruiz and Alonso's reliability, Eldridge testified, "They're corrupt to the core." When Eldridge was asked whether Alonso and Ruiz were reliable on October 23, 2001, he responded, "There's no reason to use these guys." In accordance with the jury instructions, appellant has failed to demonstrate the evidence would not support a conviction if the jury believed Ruiz was the informer. Moreover, we note the State did not emphasize the error because no reference was made to the excluded evidence in closing arguments. *See Motilla*, 78 S.W.3d at 359. Combining this with the overwhelming evidence of appellant's guilt, we cannot say the trial court's error, if any, had a substantial and injurious effect or influence on the jury's verdict. *See Morales*, 32 S.W.3d at 867. Appellant's fifth issue is overruled.

### State of Mind Exception to the Hearsay Rule

In his sixth issue, appellant argues the trial court erred by allowing testimony that Alonso was "reluctant" to deal with Jose Mendoza while prohibiting more specific testimony that Alonso was afraid to

25. Appellant objected to this portion of the charge, requesting the State be required to prove Alonso was the informant to support a conviction. The trial court denied the request, and appellant does not raise the issue on appeal.

26. Alonso and Ruiz were identified in the confidential informant documents according to their confidential informant (or "CI") num-

bers, which were 2253 for Alonso and 2344 for Ruiz.

27. These transactions occurred after Turnage told appellant, in early September, to stop using and paying Alonso as a confidential informant. Turnage said he did not know of Ruiz's close association with Alonso but that his order should have applied to both of them.

deal with Mendoza because he suspected Mendoza had killed a man. Appellant argues that if the jury had been told of the reason behind Alonso's fear, it is more likely the jury would have concluded Ruiz, not Alonso, was the confidential informant described in the Jose Mendoza search warrant affidavit. Citing the "state of mind" exception to the hearsay rule, appellant argues this evidence should have been admitted "because it was imperative that the jury understand Alonso's state of mind in order to determine who the relevant informant was in the warrant affidavit."

*Background*

During her testimony, as stated above, Poche told the jury she interviewed Alonso and Ruiz several times as part of the FBI investigation. After defense counsel asked her whether Alonso had "admitted to committing crimes," the prosecutor objected and the jury was excused. The trial court then held a hearing to consider, among other issues, the defense's request to ask Poche about statements by Alonso that he was reluctant "to do a drug deal" for appellant at 5972 Marine Way because Jose Mendoza was a "bad man" and he was afraid of him. Referring to Poche's "302" [28] report of her interview with Alonso, defense counsel questioned her out of the jury's presence as follows:

Q. [DEFENSE COUNSEL:] Did Mr. Alonso tell you that he was reluctant to do a drug deal for Mark De La Paz [sic] at 5972 Marine Way because the resident of the property, Jose Mendoza, is a bad man?

A. Yes.

Q. Did he tell you that—Mr. Alonso tell you that Alonso knew a man who worked with Mendoza and he had been killed?

A. Yes.

Defense counsel argued that evidence of why Alonso was afraid of Mendoza would show Alonso did not go to Mendoza's residence to buy drugs and support the defense's theory that Ruiz was the confidential informant referred to in the Mendoza search warrant affidavit:

This is evidence—it shows why he didn't go there. That's proof, that's proof of why he didn't go. He's afraid. The issue is the search-warrant affidavit refers to one informant who went to the location. Alonso is saying, 'I know the guy. I bought drugs from him before. I'm afraid of him because I think he killed a guy. I'm not gonna go there when a bust happens.' Apparently, Mendoza doesn't know Ruiz. He's willing to go there. Alonso knows him. He's afraid and stays away. That's extremely probative of why it's Ruiz and not Alonso.

Responding to this argument, the prosecutor informed the court he had evidence Ruiz made a statement that Alonso had gone to the Mendoza residence on October 21, 2001, but he did not believe he could offer the statement in good faith because there was "[n]o legitimate hearsay exception" to justify its admission. Then, he added the following:

The law does not require that only one human being go down to the location on the 22nd. Five people could have gone; 10 people could have gone. What we have to show: Who was the guy on the search warrant on the 23rd. Documentary evidence is clear. He paid Enrique Alonso on the 23rd, on the 25th, for this search warrant. The rest is hearsay, double hearsay.

The trial court ultimately ruled the statements about Mendoza being a "bad

---

**28.** "An FBI Form 302 is a written report which an agent compiles from notes taken contemporaneously during a surveillance or an interview of a suspect or witness." *Kiley v. United States,* 260 F.Supp.2d 248, 254 n. 4 (D.Mass.2003).

man" and possibly having killed someone were inadmissible because they were not relevant.[29] When the jury returned to the courtroom, the defense was allowed to question Poche about statements by Alonso that he bought drugs from Mendoza for his own personal use but never bought drugs for appellant. The defense was also allowed to elicit testimony from Poche that Alonso was "reluctant" to do a drug deal for appellant at Mendoza's residence. However, the defense was not allowed to question Poche about why Alonso feared Mendoza.[30]

### Standard of Review

We review the trial court's admission or exclusion of testimony under an abuse of discretion standard. *Salazar*, 38 S.W.3d at 153–54; *Coffin v. State*, 885 S.W.2d 140, 149 (Tex.Crim.App.1994); *Martinez v. State*, 186 S.W.3d 59, 66 (Tex.App.-Houston [1st Dist.] 2005, pet. ref'd). We will uphold the trial court's decision unless it lies outside the "zone of reasonable disagreement." *Salazar*, 38 S.W.3d at 153–54.

### Applicable Law

■ Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. Tex.R. Evid. 801(d). An extrajudicial statement or writing that is offered for the purpose of showing what was said rather than for proving the truth of the matter stated therein does not constitute hearsay. *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim.App.1995); *Martinez*, 186 S.W.3d at 66.

■ Hearsay statements are generally inadmissible. Tex.R. Evid. 802. However, there are a number of exceptions to this general rule. *See* Tex.R. Evid. 803. Under the "state of mind" exception, a statement is not excluded by the hearsay rule if it is:

[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Tex.R. Evid. 803(3). Thus, a statement that would otherwise be admissible under

---

29. In reaching this conclusion, the trial court appears to have been concerned that if it allowed the defense to elicit evidence about what Alonso and Ruiz told Poche regarding the Mendoza deal, it would be "open game" for either side to present evidence concerning other statements about extraneous offenses connected to appellant:

Well, you know, again, I don't think there's any way for me to resolve this issue. One way to do it is I'm gonna let you go into anything this witness heard from Alonso and Ruiz, and limit it to this Mendoza incident. That's gonna be open game for either side.

30. The relevant testimony before the jury was as follows:

Q. [DEFENSE COUNSEL:] And Mr. Alonso told you he knew the resident of the property, Jose Mendoza; is that right?
A. Yes.
Q. He said he was—Mr. Alonso said he was reluctant to do a deal, drug deal, for Mr. De La Paz [sic] at that address 5972 Marine Way, the address of Jose Mendoza; is that right?
A. That's right.
Q. Mr. Alonso told you that he, Mr. Alonso, had bought drugs from Mr. Mendoza for his own use, right?
A. Right.
Q. But he told you that he had never bought drugs for Mr. Del La Paz [sic] from Mr. Mendoza at this 5972 Marine Way address; is that right?
A. Yes.

the state of mind exception to the hearsay rule is inadmissible if it is a "a statement of memory or belief" offered to "prove the fact remembered or believed." *See id.*; *Gibbs v. State*, 819 S.W.2d 821, 837 (Tex. Crim.App.1991) (admitting statements of memory or belief would virtually destroy hearsay rule by allowing state of mind, provable by hearsay statements, to serve as basis for inferring happening of event which produced state of mind) (citing 33 GOODE, WELLBORN & SHARLOT, TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 803.7 (Texas Practice 1988)). One federal court offers the following explanation of rule 803(3)'s "exception to the exception:"

> Case law makes it clear that a witness may testify to a declarant saying "I am scared," but not "I am scared because the defendant threatened me." The first statement indicates an actual state of mind or condition, while the second statement expresses belief about why the declarant is frightened. The phrase "because the defendant threatened me" is expressly outside the state-of-mind exception because the explanation for the fear expresses a *belief* different from the *state of mind* of being afraid.

*United States v. Ledford*, 443 F.3d 702, 709 (10th Cir.2005).

*Analysis*

■■■ Noting the general prohibition against the admission of statements "of memory or belief to prove the fact remembered or believed," the State argues the excluded portion of Alonso's statement was inadmissible because it was not limited to Alonso's actual state of mind but explained the reason for his alleged fear. To support this argument, the State cites *Barnum v. State*, 7 S.W.3d 782 (Tex.App.-Amarillo 1999, pet. ref'd); *Buhl v. State*, 960 S.W.2d 927 (Tex.App.-Waco 1998, pet. ref'd); and *Norton v. State*, 771 S.W.2d 160 (Tex.App.-Texarkana 1989, pet. ref'd). We will examine each of these cases.

In *Barnum*, the defendant was convicted of murder. *Barnum*, 7 S.W.3d at 786. At trial, the State admitted a written statement by the victim, to which the defendant objected on the basis of hearsay and the Sixth Amendment, which read, "Today I found the attached paper. The paper with figures was written by my husband Barak Lee Barnum. I believe he may be contemplating murdering me for my $100,000.00 life insurance policy." *Id.* at 789. The court of appeals found the first two sentences were not statements of the victim's "state of mind or emotions." *Id.* at 790–91. They were "simply out-of-court statements of events which have occurred." *Id.* at 791. The last sentence was "an out-of-court exposition" of the victim's "belief" and demonstrated her "fear or state of mind, other than her recited 'belief,' only by inference." *Id.*[31] All three statements were therefore inadmissible hearsay, but given the strength of the State's case, the error did not affect the defendant's sub-

---

**31.** The court noted the victim's statement was very similar to an oral statement made by the shooting victim in *Vann v. State*, 853 S.W.2d 243 (Tex.App.-Corpus Christi 1993, pet. ref'd), another case which is cited by the State. In *Vann*, the State elicited testimony from a witness that the deceased "was not happy about his marriage and wanted to find a way out." *Id.* at 249. The witness then testified that the deceased said, "I wouldn't be surprised if [deceased's wife] was waiting for me at home with a gun and shot me." *Id.* The court of appeals concluded this was error because "the State attempted to go behind the victim's mental condition to uncover its cause. In other words, the State used the victim's mental condition to produce evidence of events that events occurred or conditions existed which produced the victim's mental condition." *Id.* at 250 (citing *Gibbs*, 819 S.W.2d at 837).

stantial rights under Texas Rule of Appellate Procedure 44.2(b). *Id.*

In *Buhl*, a capital murder case, a third-party witness attempted to testify to a prior statement by the appellant that the appellant feared the victim because the victim had pulled guns on the appellant in the past. *Buhl*, 960 S.W.2d at 932. After comparing the out-of-court statement to the testimony in two previous cases,[32] the court of appeals noted that rule 803(3) would support the appellant's argument if defense counsel had simply wanted the witness to relate that appellant said he was afraid of the victim "because his fear would appear to be statement of then existing emotional condition." *Id.* at 933. However, when defense counsel sought to elicit an explanation of the reason for the defendant's fear, i.e., that it was caused by the victim's previously pulling a gun on him, the trial court acted within its discretion to exclude this testimony because it "was offered to prove the truth of a fact that the declarant remembered or believed," i.e., the victim pulled guns on the appellant in the past. *Id.*

In *Norton*, a murder case, the victim's wife testified that shortly before his death, her husband told her he intended to go to the defendant's shop and he was going there because the defendant had called and asked him to go. *Norton*, 771 S.W.2d at 165. The court of appeals noted that "statements looking into the future" were admissible under the "state-of-mind" exception but "[t]o admit memory declarations under the state-of-mind exception would defeat the entire hearsay rule." *Id.* at 166. The court concluded the murder victim's statement that he intended to go to the shop "was admissible for the limited purpose of showing he intended to go to the shop to help" the defendant, but the testimony that the victim was going there because the defendant called and asked him to come stated "a fact remembered which is specifically excluded from the [state-of-mind] exception." *Id.*

*Barnum*, *Buhl*, and *Norton* illustrate the general rule relied upon by the State that statements are inadmissible hearsay when they are not limited to the declarant's state of mind but explain the reason for the declarant's alleged fear. *See, e.g.*, *Barnum*, 7 S.W.3d at 790; *Buhl*, 960 S.W.2d at 933. Applying this principle to the case before us, the State claims Poche's statement that Alonso was "reluctant to do a drug deal for" appellant was admissible, but her testimony explaining the reasons behind Alonso's reluctance was not admissible under rule 803(3).

In his reply brief, appellant concedes that *Barnum* and *Buhl* support the State's position, but he argues neither appellate court decision is binding on us. *See Jeffery v. State*, 169 S.W.3d 439, 443 n. 1

---

**32.** The court cited *Pena v. State*, 864 S.W.2d 147 (Tex.App.-Waco 1993, no pet.); and *Williams v. State*, 927 S.W.2d 752 (Tex.App.-El Paso 1996, pet. ref'd). In *Pena*, the Waco court held admissible, under the state of mind exception, a witness's testimony that the victim wanted to leave the defendant, but felt economically trapped. This statement reflected the victim's state of mind and was not offered to prove the truth of the matter asserted. *Pena*, 864 S.W.2d at 149. In *Williams*, the El Paso court held admissible testimony that the defendant would hurt the victim or her child if she returned to her residence:

Hill's testimony was not offered to show that appellant would in fact hurt [the victim] or take [her daughter] if confronted, but to reveal her state of mind at the time of the offense. Even though Hill's testimony was admitted before appellant testified, it later served to rebut appellant's claim that the victim was the aggressor and physically attacked him and that she threatened to take [the daughter] from him.

*Williams*, 927 S.W.2d at 764.

(Tex.App.-Texarkana 2005, pet. ref'd) (opinions from any federal or state court may be relied on as persuasive authority, but Texas appellate court is obligated to follow only higher Texas courts and United States Supreme Court). Instead, appellant proposes we follow *Rogers v. State,* 183 S.W.3d 853 (Tex.App.-Tyler 2005, no pet.); and *Williams v. State,* 798 S.W.2d 368, 371 (Tex.App.-Beaumont 1990, no pet.). He also cites federal decisions. *See United States v. Blanton,* 793 F.2d 1553, 1562 (10th Cir.1986); *United States v. Grassi,* 783 F.2d 1572, 1577–78 (11th Cir. 1986). The problem with appellant's argument, however, is that *Buhl, Barnum,* and *Norton* are by no means the only cases that support the State's position. Furthermore, the cases he cites are distinguishable.

Beginning with *Williams,* which was a prosecution for aggravated sexual assault, the State called as a witness the deputy who had been dispatched to the hospital to speak with the victim shortly after she reported the sexual assault to the authorities. *Williams,* 798 S.W.2d at 370. The deputy testified that during the interview at the hospital, the victim was crying, shaking, and scared, and she kept telling the deputy the defendant was going to come back and kill her and her children. *Id.* at 371. The deputy further indicated the victim was very disturbed. *Id.* The court of appeals characterized the officer's testimony as a description of "the victim's then existing state of mind" and found it admissible under the state of mind exception to the hearsay rule. *Id.* As we read

*Williams,* however, the court's decision merely authorized the admission of testimony that the declarant was afraid of retaliation by the defendant in order to show fear.[33] *See id. Williams* is consistent with the general rule that statements a declarant is afraid or testimony showing she was afraid when he made the statement are admissible under rule 803(3). *See Martinez v. State,* 17 S.W.3d 677, 688 (Tex.Crim.App.2000) (allowing declarant's statement that she was afraid of man with same first name as appellant).

In *Rogers,* a felony murder case, the State offered a recorded telephone message left by the victim for her attorney and boss four days before her death stating, in part, that things had escalated between the defendant and herself to a point where the defendant had threatened "to kill himself, or kill me and himself, and at one point he even threatened to kill you." *Rogers,* 183 S.W.3d at 864. The victim also stated the defendant had hit himself in the head with a dumbbell. *Id.* Although the court agreed with the State that these portions of the telephone message were admissible under rule 803(3) because they described the victim's state of mind, *see id.* at 865, we find no support in *Rogers, Williams,* or any other case for the admission of statements explaining why the declarant held a particular state of mind or what he might have believed would have induced that particular state of mind.

Turning to the federal cases cited by appellant, we note that *Grassi* and *Blanton* involved prosecutions for extortion under the Hobbs Act, which prohibits in-

---

**33.** Some commentators have criticized *Williams,* arguing the victim's references to threats by the defendant are statements of memory that should not be admitted under rule 803(3). *See* GOODE, ET AL., GUIDE TO THE TEXAS RULES OF EVIDENCE § 107.1 n.7 (noting that the *Williams* "opinion gives no clue concerning how the victim's state of mind at the

time of the statement might have been relevant to any issue in the case. The victim's references to threats by the defendant were statements of memory which should not be admissible under Rule 803(3)"). Because *Williams* is distinguishable from the matter before us, however, there is no need for us to consider this question.

terference with interstate commerce by extortion, attempted extortion, or conspiracy to commit extortion. *See* 18 U.S.C. § 1951(a). The victim's fearful state of mind is a crucial element in proving extortion under the Hobbs Act. *See id.* § 1951(b)(2) (defining extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right"); *Blanton,* 793 F.2d at 1562 n. 13; *Grassi,* 783 F.2d at 1577–78. Therefore, it is hardly surprising that statements by the victims about their fearful states of mind immediately prior to the crime would be admitted. *See Blanton,* 793 F.2d at 1562; *Grassi,* 783 F.2d at 1577–78.

A more persuasive federal case is *United States v. Cohen,* 631 F.2d 1223 (5th Cir.1980), where a defendant charged with impersonating a federal agent argued he lacked the requisite intent because he acted under duress. *Id.* at 1225. As evidence of duress, he attempted to introduce out-of-court statements he had made relating alleged threats by Galkin, a co-conspirator. *Id.* In approving the trial court's rule 803(3) [34] admission of the defendant's out-of-court statements that he was scared, but not the alleged basis for his fear, the Fifth Circuit explained:

> Appellant seeks to stretch the limited scope of admissibility under F.R.E. 803(3). That rule by its own terms excepts from the ban on hearsay such statements as might have been made by Cohen of his then existing state of mind or emotion, but expressly excludes from the operation of the rule a statement of belief to prove the fact believed. The rule thus permitted the witnesses to relate any out-of-court statements Cohen had made to them to the effect that he

was scared, anxious, sad, or in any other state reflecting his then existing mental or emotional condition. And this for the purpose of proving the truth of the matter asserted in the statement—that Cohen actually was afraid or distraught—because the preamble to F.R.E. 803 provides that such testimony "is not excluded by the hearsay rule." But the state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind. If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition—"I'm scared"—and not belief—"I'm scared because Galkin threatened me." Cohen's witnesses were permitted to relate any direct statements he had made concerning his state of mind but were prevented only from testifying as to his statements of belief—that he believed that Galkin was threatening him. . . .

*Id.* Other federal appellate courts considering this issue are consistent in holding that Federal Rule of Evidence 803(3) allows the admission of statements as to the declarant's state of mind but does not allow the admission of statements as to why the declarant has that state of mind. *See, e.g., United States v. Samaniego,* 345 F.3d 1280, 1283 (11th Cir.2003); *United States v. Tome,* 61 F.3d 1446, 1454 (10th Cir. 1995); *United States v. Cardascia,* 951 F.2d 474, 488 (2nd Cir.1991); *United States v. Emmert,* 829 F.2d 805, 810 (9th Cir.1987).

Bearing this principle in mind, we conclude appellant's reliance on *Rogers* and *Williams,* like his use of *Grassi* and *Blan-*

---

**34.** Texas's rule 803(3) is identical to the federal rule that addresses the same subject. *Com-* pare Tex.R. Evid. 803(3) *with* Fed.R.Evid. 803(3).

*ton,* is misplaced. The authorities cited by appellant would support his argument if defense counsel had limited his line of inquiry to Alonso's actual fear of Mendoza. Texas and federal law provide that statements the declarant is afraid or testimony demonstrating the declarant was afraid when he made the statement are generally admissible under rule 803(3). *See Martinez,* 17 S.W.3d at 688; *see also Cohen,* 631 F.2d at 1225. But because defense counsel also wanted to explore the reason for Alonso's fear of Mendoza, the trial court acted within its discretion in concluding such testimony was a "statement of memory or belief" offered to prove the truth of a fact the declarant "remembered or believed," i.e., that Mendoza killed a man. *See Buhl,* 960 S.W.2d at 932–33; *see also Cohen,* 631 F.2d at 1225.

Nor are we persuaded by appellant's argument that Mendoza's statement was not being introduced for the truth of the matter asserted but rather to show only that Alonso believed Mendoza killed a man. As this Court has previously stated, the test for hearsay is whether "the out-of-court statement is relevant only if the trier of fact believes that the statement was both truthful and accurate." *Bell v. State,* 877 S.W.2d 21, 24 (Tex.App.-Dallas 1994, pet. ref'd). The relevance of the evidence Poche was told, i.e., Alonso feared Mendoza because Mendoza killed a man, depended on the truthfulness of the fact asserted, i.e., that Mendoza killed a man. Therefore, we conclude the trial court acted within its discretion in excluding such evidence. Appellant's sixth issue is overruled.

### The Jury Charge

In his seventh issue, appellant argues the jury was erroneously instructed to assume the truth of one of the State's allegations. Before retiring to deliberate appellant's guilt or innocence, the jury was instructed in part as follows:

Now bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt that on or about the 23rd day of October, 2001, in Dallas County, Texas, the defendant, MARK ANTHONY DE LA PAZ, did then and there, knowing that an official proceeding or investigation was pending or in progress, to wit: a Dallas Police Department Narcotics Division Investigation, with intent to affect the outcome of the official proceeding or investigation, did make or present or use a document, to wit: an affidavit for search or arrest warrant, hereinafter "affidavit," dated the 23rd day of October, 2001, for the premises located at 5972 Marine Way, Dallas, Texas, *with knowledge of its falsity in that the defendant knew that the affidavit contained defendant's false statement* or false information that the confidential informant was reliable, or that in the past defendant had received information from the confidential informant about persons who traffic drugs in the Dallas County area and on each and every occasion the informant had proven to be true, reliable or correct, then you will find the defendant guilty as charged in the indictment.

(emphasis added.). Appellant objected to this instruction and requested that the emphasized language be changed to read, "with knowledge of its falsity in that the defendant knew that the affidavit contained an alleged false statement." The trial court denied this request. Appellant argues the above instruction improperly commented on the weight of the evidence by assuming the truth of a controverted issue in the case, that is, whether his statement was, in fact, false.

## Standard of Review

■ Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim.App.1994). First, we must determine whether error occurred. If we find error, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Id.* at 731–32; *see also Trevino v. State*, 100 S.W.3d 232, 242 (Tex. Crim.App.2003).

## Applicable Law

■ The meaning of a jury instruction must be taken from the whole charge, and jurors are not authorized to return a verdict except under those conditions given by the application paragraph of the charge. *Warfield v. State*, 974 S.W.2d 269, 271 (Tex.App.-San Antonio 1998, pet. ref'd) (citing *Plata v. State*, 926 S.W.2d 300, 302 (Tex.Crim.App.1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex.Crim.App.1997)). The application paragraph applies the law to the facts and asks ultimate guilt/innocence questions of the jury. *Degrate v. State*, 86 S.W.3d 751, 752 (Tex.App.-Waco 2002, pet. ref'd) (citing *Plata*, 926 S.W.2d at 302–03). A jury charge is adequate

> if it either contains an application paragraph specifying all of the conditions to be met before a conviction under such theory is authorized, or contains an application paragraph authorizing a conviction under conditions specified by other paragraphs of the jury charge to which the application paragraph necessarily and unambiguously refers, or contains some logically consistent combination of such paragraphs.

*Plata*, 926 S.W.2d at 304.

Under section 37.09(a)(2) of the Texas Penal Code, the offense of tampering with or fabricating physical evidence is committed when a defendant, "knowing that an investigation or official proceeding is pending or in progress ... [,] makes, presents, or uses any record, document, or thing with knowledge of its falsity and with the intent to affect the course or outcome of the investigation or official proceeding." Tex. Pen.Code Ann. § 37.09(a)(2) (Vernon 2003). In their jury form charge manual, McCormick and Blackwell suggest that for the offense of tampering with or fabricating physical evidence, the jury instruction should inform the jury it must find the defendant did make a record or document of a thing "with knowledge of its falsity." 8 Michael J. McCormick, Thomas D. Blackwell & Betty Blackwell, Texas Practice: Criminal Forms & Trial Manual § 126.4, IV (11th ed.2005).

■ Article 36.14 of the code of criminal procedure governs the charge to the jury. It requires the trial court to submit its charge "not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury." Tex.Code Crim. Proc. Ann. art. 36.14 (Vernon Supp.2006). A charge that constitutes a comment by the court on the elements of the offense charged or assumes the truth of a controverted issue is a comment on the weight of the evidence and is erroneous. *Whaley v. State*, 717 S.W.2d 26, 32 (Tex.Crim.App. 1986); *Grady v. State*, 634 S.W.2d 316, 317 (Tex.Crim.App.1982). In determining whether an instruction is a comment on the weight of the evidence, we must consider the court's charge as a whole. *Russell v. State*, 749 S.W.2d 77, 79 (Tex.Crim. App.1988).

## Application of Law to Facts

■ Appellant claims the assumption implicit in the trial court's instruction, i.e., that his statement was false, is similar to

the jury charge defect discussed in *Andrews v. State*, 652 S.W.2d 370 (Tex.Crim. App.1983), an obscenity case, where the court of criminal appeals agreed with the court of appeals that the application paragraph of the charge was defective because it assumed two essential facts: (1) the magazine in question was obscene material, and (2) it depicted and described "patently offensive" representations of actual or simulated sexual intercourse, anal intercourse, and oral sodomy. Therefore, the charge may have erroneously led the jury to believe it could convict appellant if it found he sold the magazine, even if it did not find the magazine to be obscene. *Id.* at 374.[35]

However, the charge in this case does not suffer from the same defect as the charge in *Andrews*. In *Andrews*, the charge described the magazine as "patently offensive," rather than allowing the jury to determine whether or not the material was obscene. *See id.* The application paragraph in the present case, by contrast, does not assume the falsity of the statement or information. It simply tracks the language provided in the penal code. *See* Tex. Pen.Code Ann. § 37.09(a)(2). Looking at the charge in this case, the jury would not read the application paragraph as permitting it to convict without first finding the statement was false. After reading the entire application paragraph and the charge as whole, the jurors would understand they could find appellant guilty only *if* they found the affidavit contained a false statement or false information. Further-

more, the term "alleged falsity" does not appear in the statute defining the offense or in the manual containing the suggested jury charge for that offense. Nor are we aware of any case approving, in a prosecution for fabricating or tampering with physical evidence, of the language "with knowledge of its *alleged* falsity." Indeed, the use of the word "alleged" in conjunction with "false statement" in the application paragraph is confusing, ambiguous, and not provided for by section 37.09(a)(2). We conclude the application paragraph of the court's charge does not constitute a comment on the weight of the evidence. Appellant's seventh issue is overruled.

### *Brady* Claim

In his eighth and final issue, appellant asks us to review seven boxes of documents the trial judge reviewed in camera and then ordered sealed. Appellant asks us to determine whether the judge properly concluded the records did not contain any *Brady* material.

 Under *Brady v. Maryland*, 373 U.S. 83, 87–88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the State has an affirmative duty to disclose evidence favorable and material to a defendant's guilt or punishment under the due process clause of the Fourteenth Amendment. *Thomas v. State*, 841 S.W.2d 399, 407 (Tex.Crim.App. 1992). This duty attaches with or without a request for the evidence. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct.

---

**35.** The application paragraph in *Andrews* read as follows:

> Therefore, if you believe from the evidence beyond a reasonable doubt that the defendant, William Andrews, in Harris County, Texas, on or about the 7th day of August, 1980, did, knowing the content and character of the material, intentionally sell to O.W. Farrell obscene material, namely one magazine entitled "Swedish Erotica No. 25"

> *which depicts and describes patently offensive representations of actual or simulated sexual intercourse, and oral sodomy, then you will find the defendant guilty of the alleged offense.* If you do not so believe, or if you have a reasonable doubt thereof, you will find the defendant not guilty.

*Andrews*, 652 S.W.2d at 373 (emphasis added).

3375, 87 L.Ed.2d 481 (1985). When unsure of whether to disclose the evidence, the prosecutor should submit the evidence to the trial court for consideration. *United States v. Agurs*, 427 U.S. 97, 106, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Thomas*, 841 S.W.2d at 407.

In this case, the State tendered seven boxes of documents to the trial court for a determination of whether they should be disclosed to the defense.[36] After reviewing them in camera, the trial judge determined the documents did not contain any *Brady* material that "should be turned over to defense counsel." The trial judge also ordered the documents sealed and made "available for appellate review should they be required."

After reviewing the sealed records, we conclude the trial court did not err in concluding the records did not contain any *Brady* material. We overrule appellant's eighth issue.

We affirm the trial court's judgment.

---

**36.** This is consistent with *Thomas v. State*, 837 S.W.2d 106, 114 (Tex.Crim.App.1992), wherein the court of criminal appeals suggested the following procedure:

[The] information should be inspected by the trial court in camera. Neither the attorneys for the State nor defendant should be present. It will be the responsibility of the court to determine if the produced information contains *Brady* evidence. The court must, in its sound discretion, take steps to ensure that, to the extent possible, the information remains confidential. If the information is deemed material at the time it is inspected or at any future stage of the trial, it must be released to the defendant pursuant to well-settled precedent. At the conclusion of trial, the information shall be sealed and made part of the record.