

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00087-CR

KEITH WHITE                                                          APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

------------

## FROM THE 89TH DISTRICT COURT OF WICHITA COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In six points, Appellant Keith White appeals his conviction for assault on a public servant. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Procedural Background

A grand jury indicted White for assaulting correctional officer Jesse Sixtos by striking him with a piece of metal while Officer Sixtos was supervising inmates; the indictment listed two prior felony theft convictions as enhancement allegations. At trial, a jury found White guilty of assault on a public servant and then, proceeding to special issue #1, found that White had used or exhibited a deadly weapon during the commission of the offense. At the conclusion of the punishment phase of trial, the jury found both enhancement paragraphs true and assessed forty years' confinement. The trial court entered judgment accordingly, and this appeal followed.

## III. Competency

In his first point, White complains that the trial court abused its discretion by failing to hold a competency hearing.

### A. Standard of Review and Applicable Law

Under code of criminal procedure article 46B.004, "[i]f evidence suggesting the defendant may be incompetent to stand trial comes to the attention of the court, the court on its own motion shall suggest that the defendant may be incompetent to stand trial," and then determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial. Tex. Code Crim. Proc. Ann. art. 46B.004(b)–(c) (West 2006 & Supp. 2012). A suggestion of incompetency is the threshold requirement for an informal inquiry and may consist solely of a

2

representation from any credible source that the defendant may be incompetent; the trial court is no longer required to have a bona fide doubt about the defendant's competency. *Id.* art. 46B.004(c-1) (West Supp. 2012). Evidence suggesting the need for an informal inquiry may be based on observations made in relation to one or more of the factors described in article 46B.024 or on any other indication that the defendant is incompetent within the meaning of article 46B.003. *Id.*

Although a defendant is presumed competent to stand trial, under article 46B.003, he is incompetent to stand trial if he does not have (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding or (2) a rational as well as factual understanding of the proceedings against him. *Id.* art. 46B.003 (West 2006). Article 46B.024 sets out the following as factors that may suggest the need for an informal inquiry based on observations of the defendant: the defendant's capacity to rationally understand the charges against him and the potential consequences of the pending criminal proceedings; to disclose to counsel pertinent facts, events, and states of mind; to engage in a reasoned choice of legal strategies and options; to understand the adversarial nature of criminal proceedings; to exhibit appropriate courtroom behavior; and to testify. *Id.* art. 46B.024(1)(A)–(F) (West 2006 & Supp. 2012). Other factors, as supported by current indications and his personal history, are whether the defendant has a mental illness or is a person with mental retardation; the degree of impairment resulting from this condition or conditions

3

and the specific impact of them on his capacity to engage with counsel in a reasonable and rational manner; whether his identified condition has lasted or is expected to last continuously for at least one year; and if the defendant is taking psychoactive or other medication, whether it is necessary to maintain his competency and the effect, if any, of the medication on his appearance, demeanor, or ability to participate in the proceedings. *Id.* art. 46B.024(2)–(5) (West 2006 & Supp. 2012).

We review a trial court's decision to conduct an informal inquiry for an abuse of discretion. *Luna v. State*, 268 S.W.3d 594, 600 (Tex. Crim. App. 2008), *cert. denied*, 558 U.S. 833 (2009). An informal inquiry may be satisfied when the trial court poses simple, short questions to the defendant or defense counsel regarding the defendant's competency—"exhaustive inquisitions are not required." *Coyt-Sowells v. State*, No. 14-11-00986-CR, 2013 WL 1499579, at *1 (Tex. App.—Houston [14th Dist.] Apr. 11, 2013, no pet.) (mem. op., not designated for publication) (citing *Luna*, 268 S.W.3d at 599–600).

## B. Pretrial, Trial, and Post Trial Proceedings

First, we note that after White's third appointed counsel[2] filed a motion for examination of competency, the following conversation occurred at White's October 6, 2011 *Faretta* hearing:

---

[2]On June 2, 2011, the trial court appointed Thomas Allensworth to represent White.

4

MR. HERNANDEZ [Prosecutor]: Since there has been a Motion For Competency Exam filed, I think any discussion of replacing his attorney or allowing him to plead on his own is premature at this point.

THE COURT: Because the lawyer filed such a motion who hasn't seen the man until yesterday?

MR. HERNANDEZ: Well, I'm just saying.

THE COURT: I mean, I'm supposed to have some belief that there's some basis for an examination. You know, if he's only seen him once, I don't know how he's come to the conclusion he needs to be examined.

MR. ALLENSWORTH: Judge, I saw him during the initial pretrial and spoke to him for a good 30 to 40 minutes.

THE COURT: Well, did he talk to you like he knew where he was?

MR. ALLENSWORTH: Yes.

THE COURT: Did he answer your questions about what was going on in the courtroom?

MR. ALLENSWORTH: I don't have any doubt that he's competent, Judge.

THE COURT: So why did you file this motion?

MR. ALLENSWORTH: Because I thought it was a cautionary measure, Judge, because there may be an issue of competency raised later on. That's why.

. . . .

THE COURT: Do you think you understand what's going on?

THE DEFENDANT: Yes.

THE COURT: Do you think you're incompetent to stand trial?

5

THE DEFENDANT:  I understand this attorney is incompetent to represent me.

THE COURT:  I'm not asking you about the attorney.  I'm saying, do you think you're incompetent?

THE DEFENDANT:  Yes, sir.

THE COURT:  You think you're incompetent?

THE DEFENDANT:  Competent.

THE COURT: You think you're competent to stand trial?

THE DEFENDANT:  Yes, sir.

THE COURT:  You think you understand what's going on in here?

THE DEFENDANT:  Yes, sir.

. . . .

THE COURT:  All right.  What -- what is your position on this motion for a competency examination?

MR. HERNANDEZ:  My position is that since the defense counsel has stated that he believes he is competent and since there is no evidence contained within the motion, that it should be denied by the Court.

THE COURT:  And you've told me that you think you're competent, right?

THE DEFENDANT:  (Moving head up and down.)

THE COURT:  You have to speak out loud --

THE DEFENDANT:  Yes, sir.

The trial court denied the motion.

6

White contends that information that came to light during the course of both phases of trial should have prompted the trial court to conduct another informal inquiry into his competence and appoint an expert to examine him. White points to his trial counsel's time sheets as evidence of "a completely dysfunctional level of communication between attorney and client," and he claims that testimony by witnesses in the punishment phase brought to light "a disturbing and consistent pattern of behavior of bizarre acts."

### 1. White's Behavior—Pretrial

At the July 14, 2011 *Faretta* hearing based on White's motion involving his second appointed counsel, White indicated that he wanted to dismiss the *Faretta* hearing.  At the hearing, White also asked about a motion to quash the indictment that he had filed pro se and admitted that he had had an attorney when he filed it but that they were "on bad terms."  Allensworth conveyed on the record the State's plea offer of eight years, and White indicated that he understood when Allensworth explained that based on the charge, "if things go bad for you, the minimum punishment will be 25 years and the potential exposure would be up to life in prison."

White subsequently filed a pro se motion to withdraw Allensworth.  Before the October 6, 2011 *Faretta* hearing, Allensworth filed the motion for examination regarding incompetency, which we have already discussed above.  At the hearing, White complained that he had written to Allensworth five times without a response, that he had had only one visit with him, and that he had only seen him

7

three times in four months. The trial court pointed out to White that counsel was appointed to be his lawyer, not his babysitter. After denying the motion for a competency examination, the trial court reset the *Faretta* hearing.

White filed a pro se motion for habeas corpus relief on November 16, 2011. In his motion, he complained, among other things, that the indictment was invalid, that the special prosecutor was "posing as a criminal district attorney," and that he was receiving ineffective assistance of counsel.

At the January 19, 2012 *Faretta* hearing, White complained that Allensworth had not been to see him in three months and that no preparations had been made on his case. Allensworth informed the trial court that he had been "dealing with [White's] various things for the last two months" and explained, "I could literally work 24 hours a day answering one or another of his questions which I know the answer to that are not necessarily helpful to the presentation of his defense." Allensworth stated that he was prepared to represent White and agreed that he had not seen White in three months, stating, "If he wants me to spend some time with him, that's fine by me, but I think I can do more for my client sitting in front of a computer or reading the file than talking with him."

White complained that "[e]verybody else [is] getting visits except me," but he ultimately dismissed his *Faretta* request again[3] and again acknowledged that

---

[3]As referred to by White in his brief, Allensworth's applications for compensation were filed in the record. On January 30, 2012, he filed a log of his

8

he was aware that the State had offered him a plea bargain for eight years and that if he went to trial and lost, it would be twenty-five years to life with a deadly weapon finding.

At a pretrial hearing on February 9, 2012, White agreed that he had decided to continue being represented by counsel. White also informed the trial court that he wanted to object to the State requesting a deadly weapon finding, and Allensworth brought to the trial court's attention that White had told him that he wanted to be tried in prison clothing. White informed the trial court that he did not think it would make a difference because, as the incident had occurred in prison, the jury would already know that he was incarcerated. After the trial court pointed out to White that the jury had no way of knowing if he was still a prisoner unless he appeared in jail clothing, White decided to wear civilian clothing. Then

---

activities from June 3, 2011 to January 19, 2012. The log reflected that White had sent Allensworth numerous missives over the course of the case. It also reflected that,

> Like most convicts, [White] knows enough law to be a pest, and not enough[] to know that 99% of what he is talking about is not only contrary to the law, but contrary to the rules of any civilized society, be that place Terre Haute or Tehran. If you had the *Harvard Law Review* working shifts they could not stay up with his demands, nor, I suspect, figure out what the demands were in the first place.
>
> . . . .
>
> Attend[ed] *Faretta* hearing which, as I anticipated, primarily dealt with my client's anger at my reluctance to working 169 hours weeks [sic] under the gifted courtroom leadership of Keith White.

9

White again complained that the special prosecutor was "posing" as the district attorney.

At the final pretrial hearing on February 27, 2012, White informed the trial court that he planned to testify and received his admonishments. The following dialogue occurred between White and Allensworth regarding the prosecutor's ability to go into White's prior convictions during the guilt-innocence phase of trial if White testified:

> A. Okay. I don't understand that if I'm on the stand, he's bringing up my past offenses, I thought he cannot bring them up until punishment.
>
> Q. Well, you thought wrong, which is what I told you on Friday. If you testify, and you have a criminal history, then the prosecutor is allowed to go into those criminal convictions.
>
> A. All right. That's fine.
>
> Q. Okay.
>
> A. We're still going.
>
> Q. Okay.
>
> A. I'm still testifying.
>
> Q. Okay.
>
> . . . .
>
> Q. . . . Now, as you can see, these are some of the offenses which [the prosecutor is] going to charge you with and I've -- by impeachment of conviction of crimes and/or bad acts. Now, not all of these I believe are going to come in because I'm not exactly sure that the disrespect to jail staff and indecent exposure has yet resulted in a conviction anymore than I can feel that lying to detention staff, but the substantive offenses, your previous felony

convictions, specifically, the one for burglary, specifically the one from stealing a car in Houston will come in I guarantee it. Is it . . . still your desire [to] testify?

A. Yes.

The trial court then observed that White appeared to understand that he did not have to testify and that if he chose to do so, then the law permitted within certain limitations questioning about prior felonies. White than asked,

I wouldn't -- don't understand. Why would I not testify? It would be like something I'm hiding. I want to get up there and tell the truth -- . . . -- how it's supposed to be told. Now, I'm going to tell -- I'm not going to dispute him on my past offenses. I did that. And if he look at the record, it'll say that I proved guilty. But I'm not going to prove guilty on this, something that I did not do and I'm willing to explain on the stand and prevent -- present the facts.

## 2. White's Behavior During Trial

After voir dire on February 27, 2012, the trial court declared a mistrial because Allensworth had nodded off. White argued to the trial court that he wanted to keep that jury because they had been observant and were concerned about his counsel having fallen asleep.

The following day, after a new jury was selected and before trial began, at White's insistence, his counsel raised two motions—the first pertaining to the prosecutor's ability to prosecute the case and the second pertaining to White's claim that there was never a probable cause affidavit submitted to the grand jury. The State offered five years and a waiver of the deadly weapon finding as a final plea bargain to White. White refused, stating, "We're going to trial. I want to go to trial. I don't want no plea deals. We're going to trial."

11

Before White testified, the prosecutor made a motion in limine to prevent White from mentioning any of the previous plea bargain offers. White's counsel asked him:

> Do -- did you understand what they just said? The one thing that you're not allowed to speak about are the various offers that the State has given you in this case, not the five-year offer they gave you earlier, not the eight-year offer. You cannot discuss any plea negotiations or say something to the effect, well, the reason I'm here is because I turned down those offers because I've got my story to tell. Do you got that?

White said that he understood, and he did not go into the plea offers during his testimony.

The State's theory of the case was that White had assaulted Officer Sixtos by poking him in the face with a homemade spear made from paper and a staple when the officer approached his cell. White's theory of the case was that Officer Sixtos was lying and had a five-man team strip search him and leave him naked in another cell as retaliation for a grievance that he had written against Officer Sixtos two months before.[4] White acknowledged during his testimony that he was a "writ writer," that he had lost his good time credit during his twenty-year sentence for not following the rules, and that he was in administrative segregation—also known as solitary confinement—when the incident occurred.

---

[4]During his testimony, White gave a coherent, detailed report of the events as he saw them, including the officers' search of his cell and body. He testified that he had read the procedure plan for such searches, and he insisted the officers did not follow the correct procedure because "any time an officer gets stabbed or something, they're supposed to come in the cell and tell me to relinquish a weapon" before beginning a search.

12

White also testified that he obtained his GED and completed some college vocational training during the first two years of his twenty-year sentence. During his time in prison, he had also educated himself on the law, fought for inmates' rights, and wrote grievances about officers, including Officer Sixtos, "for doing unprofessional things." White claimed that he had had officers' ranks taken from them or caused them to lose their jobs and said that he considered this an accomplishment.

During the State's closing argument, White interrupted, complaining that there had been a videotape of the officers abusing him and that everyone had declined to call his witnesses. After the trial court instructed him that if he did not remain quiet, he would be removed from the courtroom, White made no further interruptions.

The jury found White guilty, and before the punishment trial began, Wichita County Sheriff's Deputy Ed Daniels informed the trial court that White had refused to return voluntarily and that White had taken off his civilian clothes, thrown them on the floor, and said that he was not going back to court. Deputy Daniels also stated that White had been screaming as loud as he could and was highly agitated. Sergeant Monte Deford agreed that White had used some filthy language and did not appear to want to participate in the punishment trial. The trial court entered a "not true" plea to the enhancements on White's behalf.

A series of Wichita County jail employees testified about White's behavior:

13

- On July 23, 2011, White was "out of control," and "screaming, cursing, verbally berating" a female officer for around five minutes while officers tried to remove him; White tried to incite other prisoners to riot when he realized that the officers were going to remove him from his cell.

- Around 6:18 a.m. on August 18, 2011, White waited until a female guard brought him his coffee and then masturbated in front of her; he cursed at her when she told him his behavior was inappropriate and that he would be written up.

- Around 2:30 a.m. on September 15, 2011, White stood on a property box in the window of his solitary cell so a female guard could not miss him masturbating. White cursed at her when she told him that his behavior was inappropriate and that he would be written up.

- On October 16, 2011, White destroyed some jail property in violation of the oral and written directives that he had been given when he came into custody.

- At around 2:15 a.m. on December 26, 2011, a detention officer testified that White was upset over a cell search and kept hitting the emergency intercom button to tell the control room operator to "suck his dick." He stated that this type of behavior was not unusual for White, who had flooded his cell two days later because he did not like the cell he had been moved into, and that after White started kicking the cell door, the detention officers had to restrain White with leg restraints to keep him from hurting himself and destroying the cell.

- On January 1, 2012, White ripped off the blood pressure cuff that a nurse was using to take his blood pressure, threw it on the ground, and started stomping on it. When he threw the pieces of the destroyed cuff back through the slot in the cell door, White yelled, "I told you MF'ers, I was going do this every MF time."

- On January 7, 2012, White masturbated in the window in front of another female guard. When the guard's supervisor talked to White, White replied that it was a free country and he could masturbate anywhere he wanted.

- On January 29, 2012, White stood on a property box and masturbated in front of a female guard. That guard testified that White could have masturbated without being seen but chose to do it where the guards would have to see him.

14

One of the jail employees agreed that White could be a "mouthy, resistant individual" and that he appeared to take a perverse pleasure in making things difficult. White had also threatened him and others. Another said that White had mentioned a vast, dark conspiracy against him to keep him in jail for a long time and described White as a "very mean individual."

Lieutenant Daryl Bonnin, the assistant jail administrator, testified that he had investigated White's complaints against officers and that it was "[v]ery, very difficult to find anything even remotely accurate to what he -- he writes in his complaints." During cross-examination, Lieutenant Bonnin indicated that White would not be treated for mental illness unless White reported that he thought he had one and wanted treatment. He agreed that White was always convinced that he was in the right and harbored certain conspiracy theories. During redirect, he agreed that White was a "jailhouse lawyer" and liked to accuse officers of misconduct. During recross-examination, he stated that White did not think he caused problems, that White thought he was just responding to the instigation of problems by the jail staff, and that

> a lot of the problems we have with him are repetitive. They're -- they're the same things. You know, we pass the meals every time -- at the same time every day. We pass out laundry at the same time every day. *He knows the rules. He knows the processes. He knows the procedures, but he doesn't like doing things the way that we do them in the jail. He wants to do them either on his own time or his own schedule or something like that. And that's generally what causes the problems.* [Emphasis added.]

15

Deputy Daniels testified that after the guilt-innocence phase, White had been taken back to the jail for lunch and informed the guards that he was not going back to court. He repeated for the jury that White had taken off his civilian clothes and thrown them on the floor, adding that White still had his green jail uniform on underneath. He stated that White had refused to talk to Allensworth about going back to court for the punishment phase.

### 3. White's Behavior Post Trial

After the jury was discharged, White was brought back into the courtroom for pronouncement of his sentence, where he cursed at the trial judge and cursed about Allensworth. The trial court pronounced judgment, informed White of his right of appeal, and told the bailiff to remove him.

Allensworth filed a motion for new trial for White, complaining, among other things, that the jury's punishment verdict was excessive and grossly disproportionate to the offense. White's appellate counsel filed a first amended motion for new trial, incorporating the previous motion by reference, arguing that the punishment sentence was grossly excessive and disproportionate and asking the trial court to set aside the deadly weapon finding. The trial court denied the motion.

White then filed a pro se motion to withdraw both motions, arguing that he had not consented to their filing, particularly with regard to his punishment. White stated, "Defendant never complained about the sentence he received, but

16

about the evidence that would [have] exonerated [him]," which he complained his trial counsel had suppressed.

## C. Analysis

We first note that while White's refusal to return to the courtroom after the jury convicted him may have been disruptive, this behavior was not probative of incompetency. *See Moore v. State*, 999 S.W.2d 385, 395 (Tex. Crim. App. 1999) (rejecting claim that disruptive courtroom behavior was probative of incompetence because otherwise "one could effectively avoid criminal justice through immature behavior"), *cert. denied*, 530 U.S. 1216 (2000).

Further, although White argues that Allensworth's timesheets illustrate White's inability to communicate with him, as set out above, the record reflects that White was able to understand the proceedings and to converse with his attorney. *See Ford v. State*, No. 05-04-01819-CR, 2006 WL 710946, at *2–3 (Tex. App.—Dallas Mar. 22, 2006, pet. ref'd) (not designated for publication) (observing that defendant was able to communicate with his attorney even though he wanted his attorney declared ineffective and "disagreed with and disregarded his attorney's advice at times"); *see also Guerrero v. State*, 271 S.W.3d 309, 312–16 (Tex. App.—San Antonio 2008) (observing that two trial judges conducted informal inquiries into defendant's mental competence in two pretrial *Faretta* hearings and found him competent, that the record from these pretrial proceedings contained no evidence suggesting that he did not have a rational as well as factual understanding of the proceedings against him, and that

17

the record from the trial proceedings did not show "some evidence" to suggest he was incompetent to stand trial), *rev'd in part on other grounds*, 305 S.W.3d 546, 561 (Tex. Crim. App. 2009).

As set out in extensive detail above, the record holds no suggestion that White was incompetent to stand trial, as his statements and testimony showed that he had "sufficient present ability to consult with [his] lawyer with a reasonable degree of rational understanding" and that he had a "rational as well as factual understanding of the proceedings against [him]." *See* Tex. Code Crim. Proc. Ann. art. 46B.003(a). Rather, the record reflects that the witnesses and other trial participants merely found White unpleasant, particularly when he did not get what he wanted.

The record further reflects that White had the capacity during the proceedings to understand the potential consequences of rejecting the State's plea offers; that he disclosed to counsel pertinent facts, events, and states of mind; that he understood the adversarial nature of the proceedings; that—until the jury convicted him—he exhibited appropriate courtroom behavior; and that there was no indication that he had a mental illness, was taking psychoactive medication, or suffered from mental retardation. *See id.* art. 46B.024(1)–(5); *see also Jackson v. State*, 391 S.W.3d 139, 143 (Tex. App.—Texarkana 2012, no pet.) (noting that defendant's "responses to questions were lucid, and her pleas to the court to grant her community supervision intelligent"); *Davis v. State*, No. 09-10-00080-CR, 2010 WL 4156455, at *2 (Tex. App.—Beaumont Oct. 20, 2010,

18

no pet.) (mem. op., not designated for publication) (concluding that defendant's testimony "reflected his understanding of the use of enhancements in the punishment phase; his reading selections, arguments, and responses to questions reflect[ed] an understanding of the proceedings and an ability to consult with counsel"); *Rojas v. State*, 228 S.W.3d 770, 773 (Tex. App.—Amarillo 2007, no pet.) ("[Defendant's] comments, while procedurally improper and almost certainly unwise, evidenced a proper understanding of the proceeding and the factual basis for his prosecution."); *Lawrence v. State*, 169 S.W.3d 319, 322–23 (Tex. App.—Fort Worth 2005, pet. ref'd) (noting that nothing in the record raised a competency issue when most of defendant's testimony—despite his pattern of rambling speech and nonresponsive answers—"reveal[ed] that he simply wanted his day in court and wanted an opportunity to tell his story his way"). Therefore, we conclude that the trial court did not abuse its discretion by not conducting a second informal inquiry into White's competency, and we overrule White's first point.

## IV. Special Prosecution

In his second point, White argues that the trial court erred by allowing the special prosecution unit to prosecute his case because there was no showing that the special prosecutor had the authority to do so.

### A. White's Complaint in the Trial Court

As we noted in our recitation above with regard to White's competency, White filed a pro se motion for habeas corpus relief on November 16, 2011,

19

complaining that, among other things, the special prosecutor was "posing as a criminal district attorney." In the cover letter of his motion, he also requested a copy of the special prosecutor's oath of office and the district attorney's motion for appointment of special prosecutor.

At the February 9, 2012 pretrial hearing, White again brought up his problem with the special prosecutor acting as the district attorney. Specifically, White stated, "I would like to know could he show me any type of documentation that he is an Elected District Attorney or Appointed District Attorney?" After the trial court informed White that the position was created by statute and ordered the special prosecutor to provide a copy of it to White's lawyer, White replied,

> Okay. I -- I understand what you're talking about, but he's been found -- he has filed motions and acted as a District Attorney and then hide behind the State by saying he -- when he signs his signature on it, he hides under that title, attorney for the state. That's an inappropriate title.

White argued that this made all of the special prosecutor's cases void because "he has to fall under that title, District Attorney." Allensworth then added that, having looked through the trial court's file, he would stipulate that there was no document that "purports Mr. Hernandez as a special prosecuting attorney in this case," but that "pursuant to the statute as you've said, he does have the authority to act for the State in this type of prosecution. Furthermore, Mr. Hernandez has been physically sworn in by Ms. Shelton as a special prosecuting attorney to represent the State's interest in all prison cases."

20

White persisted, complaining that Shelton was still the district attorney and that

> [I]t still doesn't hide the fact that on my motions, you placed on there, "District Attorney" and "his Assistant District Attorney." That means if it was her, that would have been "her Assistant District Attorney," but you said "his" as if you was the District Attorney. You're not a District Attorney. You've been posing as a District Attorney and you're not.
>
> . . . .
>
> Then you hide behind attorney for the State. Anybody can fall for that, Attorney General, Assistant Attorney, County Attorneys, anybody can fall under attorney for the State. That's a generic title. You're supposed to specifically fall under whatever you -- you're a special prosecutor. It didn't have that title on there. It didn't have District Attorney on my motions. It has Attorney for the State. That's a generic title because anybody can fall under that.

White did not secure a ruling on this complaint.

Before trial, Allensworth raised the issue again at White's insistence, and the following dialogue ensued:

> MR. ALLENSWORTH: The first -- both filed at the insistence of my client. The first one deals with Mr. Hernandez's ability to represent the State of Texas in this case. Mr. Hernandez, as I'm sure the Court shuck will show, has been sworn in as a special prosecuting attorney under Section 2.01 and 2.02 of the Code of Criminal Procedure.
> Additionally, Mr. Hernandez previously has provided me a memorandum of the law which indicates that he, as a state official charged with prosecuting crimes on state lands or state prisons, has the authority statewide to prosecute and doesn't necessarily need the appointment of special prosecutor.
> Notwithstanding that memorandum of law and the matter which I've -- and the designation from Ms. O'Brien, which I provided to my client, my client insists that Mr. Hernandez does not have the authority to act as a special prosecuting attorney in this case.

21

As I understand my client's argument, it is because he was appointed by Ms. Shelton as opposed to a trial court judge. I think that . . . Mr. Hernandez may have some ability to cast some light on what my client's arguments are and why he -- he's considering and does not feel that the motion is valid.

THE COURT: Mr. Hernandez, you can respond.

MR. HERNANDEZ: Well, for the record, I was sworn in by Ms. Shelton to handle all the prison cases in the county. It's actually occurred several times. The last time I was sworn in was simply because Ms. Shelton couldn't find the copy of the oath of office that the Defendant was requesting, so it was done again in front of Mr. Allensworth and I believe Mr. Allensworth even got a copy of my oath of office.

MR. ALLENSWORTH: I did.

MR. HERNANDEZ: So I mean, I'm fully sworn in, Judge. I am also authorized by law to prosecute these cases and it's a pretty long and convoluted legal authority that gives our office the jurisdiction over these cases and I can give the Court a brief on it. . . .

THE COURT: I don't need it. I'm familiar.

MR. HERNANDEZ: Yeah. So I -- I'm not an attorney pro tem. I'm a special prosecutor. I have authority to handle these cases by statutory law that was granted by the legislature giving us statewide jurisdiction and I've additionally been sworn in by Ms. Shelton, so I think I'm fully authorized.

MR. ALLENSWORTH: And again, Judge, Al [Hernandez], to his credit, provided me a copy of that specific four-page single-spaced type written memorandum at least two weeks -- or two months ago. I've provided a copy of it to my client. My client found it unpersuasive as to whether he's a special prosecuting attorney.

The trial court overruled the motion.

## B. White's Complaint on Appeal

On appeal, White complains that the special prosecution unit does not have stand-alone authority to prosecute prison cases, that only the elected criminal district attorney of Wichita County can represent the State in criminal prosecutions brought in Wichita County, that "[t]here is no authority for granting the unit stand-alone authority to prosecute without a request from the elected District Attorney in Wichita,"[5] and that there is no indication that the trial court appointed the special prosecutor or that the district attorney's office requested help or the appointment of a special prosecutor.

## C. Preservation of Error

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Clay v. State*, 361 S.W.3d 762, 765 (Tex. App.—Fort Worth 2012, no pet.). The trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have

---

[5]White acknowledges that *Ferguson v. State*, 335 S.W.3d 676, 681 (Tex. App.—Houston [14th Dist.] 2011, no pet.), states that the special prosecution unit has authority to prosecute inmate offenses, but he claims that this case is flawed and should not be followed because it relied on dictum. Based on our resolution below, we do not reach this argument. *See* Tex. R. App. P. 47.1.

23

objected to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011).

Further, the complaint made on appeal must comport with the complaint made in the trial court or the error is forfeited. *Clark*, 365 S.W.3d at 339; *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009) ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial."). To determine whether the complaint on appeal comports with that made at trial, we consider the context in which the complaint was made and the parties' shared understanding at that time. *Clark*, 365 S.W.3d at 339; *Resendez v. State*, 306 S.W.3d 308, 313 (Tex. Crim. App. 2009); *Pena*, 285 S.W.3d at 464.

Based on the record before us, White's argument in the trial court was that the special prosecutor was "posing" as a criminal district attorney and therefore could not prosecute the case because he had to actually be a county criminal district attorney or had to have been appointed by the trial court. On appeal, however, White complains in part that the special prosecution unit did not have stand-alone authority to prosecute prison cases and that, without a request for assistance from the Wichita County district attorney, there was no authority for Hernandez to prosecute the case. Because this argument does not comport with his arguments in the trial court, this portion of White's second point is

24

unpreserved.[6]  *See* Tex. R. App. P. 33.1; *Clark*, 365 S.W.3d at 339.  We overrule this part of White's second point.

## D.  Appointment

In the remaining part of his second point, White argues that there is no indication that the trial court appointed the special prosecutor.

Unlike an attorney pro tem, who is appointed by the trial court when the district attorney is unable to appear in a case based on code of criminal procedure article 2.07(a), a special prosecutor is appointed by the district attorney and acts under his or her supervision and control.  *Delapaz v. State*, 228 S.W.3d 183, 195–96 (Tex. App.—Dallas 2007, pet. ref'd) (citing *State v. Rosenbaum*, 852 S.W.2d 525, 529 (Tex. Crim. App. 1993) (Clinton, J., concurring); *Mai v. State*, 189 S.W.3d 316, 319 (Tex. App.—Fort Worth 2006, pet. ref'd)); *see also Coleman v. State*, 246 S.W.3d 76, 82 n.19 (Tex. Crim. App. 2008) ("Although the terms 'attorney pro tem' and 'special prosecutor' are sometimes used interchangeably and have many similarities, the two are fundamentally different."); *Hartsfield v. State*, 200 S.W.3d 813, 817 (Tex. App.—Texarkana 2006, pet. ref'd) (stating that the county attorney must retain control and responsibility for the prosecution when using a special prosecutor).  "Court

---

[6]Further, we note that it may be inferred from the record that the county district attorney had requested Hernandez's assistance because, as acknowledged on the record by White's trial counsel, the county criminal district attorney had sworn in Hernandez to prosecute this case and others involving offenses on prison property.

approval for a special prosecutor is not required because the ultimate responsibility for the special prosecutor's actions remains with the elected district attorney." *Coleman*, 246 S.W.3d at 82 n.19. A "special prosecutor" is an attorney who is not part of the district attorney's office but who is enlisted to assist the district attorney in a particular case.[7] *Haywood v. State*, 344 S.W.3d 454, 461 (Tex. App.—Dallas 2011, pet. ref'd).

Because court approval was not required for Hernandez to be appointed a special prosecutor by the district attorney, and because based on the hearings in which this issue was discussed, the record reflects that Hernandez had the authority to prosecute the case under the district attorney's supervision and control,[8] we overrule the remainder of White's second point.

---

[7]Government code section 41.102(b) provides that a prosecutor may request the assistance of the attorney general "and the attorney general may offer to the prosecuting attorney the assistance of his office, in the prosecution of all manner of criminal cases . . . . In requesting or accepting such assistance, a prosecuting attorney may appoint any assistant attorney general as an assistant prosecuting attorney." Tex. Gov't Code Ann. § 41.102(b) (West 2004 & Supp. 2012); *see also id.* § 41.302 (West Supp. 2012) ("The special prosecution unit is an independent unit that cooperates with and supports prosecuting attorneys in prosecuting offenses and delinquent conduct described by Article 104.003(a), Code of Criminal Procedure."). Code of criminal procedure article 104.003(a) pertains to prosecution of a criminal offense, like this one, committed on property owned or operated by or under contract with the Texas Department of Criminal Justice, or "committed by or against a person in the custody of the department." Tex. Code Crim. Proc. Ann. art. 104.003(a) (West 2006 & Supp. 2012).

[8]As noted above, in the trial court, White's attorney conceded that Hernandez had been sworn in as a special prosecuting attorney by the county criminal district attorney to represent the State's interest in all prison cases and that he had received a copy of Hernandez's oath of office and had seen him sworn in by the county criminal district attorney.

26

## V. Lesser-Included Offense

In his third point, White contends that the trial court erred by denying his request for a lesser-included offense instruction on assault.

## A. Standard of Review and Applicable Law

We use a two-step analysis to determine whether an appellant was entitled to a lesser-included offense instruction. *Hall v. State*, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007); *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App.), *cert. denied*, 510 U.S. 919 (1993).

First, the lesser offense must come within article 37.09 of the code of criminal procedure. Tex. Code Crim. Proc. Ann. art. 37.09 (West 2006); *Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998). White was indicted for assault on a public servant, which required him to intentionally, knowingly, or recklessly cause bodily injury to Jesse Sixtos by striking him with a piece of metal when White knew that Sixtos was a public servant—a correctional officer—and Sixtos was lawfully discharging an official duty by supervising inmates. *See* Tex. Penal Code Ann. § 22.01(a), (b)(1) (West 2011). Assault is a lesser-included offense of assault on a public servant. *See id.* § 22.01(a)(1); *Ex parte Watson*, 306 S.W.3d 259, 273 (Tex. Crim. App. 2009) (op. on reh'g) (stating that an offense is a lesser-included offense of another offense under article 37.09(1) if the indictment for the greater-inclusive offense alleges all of the elements of the lesser-included offense).

Second, some evidence must exist in the record that would permit a jury to rationally find that if the appellant is guilty, he is guilty only of the lesser offense. *Hall*, 225 S.W.3d at 536; *Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005); *Rousseau*, 855 S.W.2d at 672–73. The evidence must be evaluated in the context of the entire record. *Moore*, 969 S.W.2d at 8. There must be some evidence from which a rational jury could acquit the appellant of the greater offense while convicting him of the lesser-included offense. *Id.* The court may not consider whether the evidence is credible, controverted, or in conflict with other evidence. *Id.* Anything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser charge. *Hall*, 225 S.W.3d at 536.

## B. Evidence

Officer Sixtos testified that he was employed as a correctional officer and that on December 16, 2008, he was on duty, in uniform, asking offenders held in administrative segregation if they wanted to go to recreation and to shower as part of his inmate-supervision duties. He was looking down at his recreation log when he approached White's cell. He asked White if he was going to recreation, and when he looked up, White used a homemade spear made from rolled up paper with a staple on the end to jab him in the cheek. Office Sixtos said that the staple went through his cheek and hit him in the top upper part of his gum, leaving a small hole in his face. He said that the weapon was not recovered.

Officer Sixtos stated that inmates housed in administrative segregation were there because they were either assaultive offenders or were in protective

28

custody for their own safety. Inmates in administrative segregation spent twenty-three hours a day in their cells, with one hour of recreation and one shower a day during which they were not allowed any human contact and were isolated from physically harming each other. During cross-examination, Sixtos said that there was no videotape of the incident with White, and he denied that he knew about White's complaints against him for use of excessive force on October 22, 2008.

Officer Christopher Beason, another correctional officer, testified that he had been operating the control station for the doors to the cell block area on the date of the incident. He said that Officer Sixtos was in uniform that day and that the uniform clearly identified him as a correctional officer. Officer Beason saw Officer Sixtos jump back from White's cell as if something had been thrown at him and then hold his left cheek, which was bleeding.

White stated that he did not assault Officer Sixtos on December 16, 2008. Instead, he said that fifteen minutes after he told Officer Sixtos that he did not want to go out for recreation, a five-man team showed up at his cell, told him to strip without explanation, placed him in handcuffs and shackles, and left him naked in another cell.

White testified that Officer Sixtos was lying because White was a "writ writer" who had written him up several times. White said that the reason he had started writing grievances against the officer was because on October 22, 2008, Officer Sixtos and another officer threw him on the floor and split his lip open. During cross-examination, White further testified that on December 16, Officer

29

Sixtos had called for the five-man team because he wanted to retaliate against White but knew that he could not just pull him out of his cell and beat him up "because he already had did that once." White said that Officer Sixtos was never injured and that the spot on his face was "a busted pimple," not a puncture wound. Photographs that were taken of Officer Sixtos's face after the incident were admitted in evidence.

## C. Analysis

White argues on appeal that based on the cell door's construction,[9] there was more than a scintilla of evidence that he did not know it was a guard that he struck. However, at trial, White denied having committed the assault at all and claimed that Officer Sixtos had lied about the assault. Additionally, there is nothing in the record to support his theory that White could have believed that it was another inmate outside of his door. Instead, based on Officer Sixtos's testimony about administrative segregation, there was no evidence that an inmate, escorted or unescorted, could have been outside of White's cell at the time of the incident.

Further, White offered no testimony to controvert Officers Sixtos's and Beason's testimonies that Officer Sixtos was in uniform and performing his regular duty as a correctional officer at the time of the assault. *See* Tex. Penal Code Ann. § 22.01(d) (West 2011) (stating that the actor is presumed to have

---

[9]Officer Sixtos described White's cell door as a metal door with a four- to six-inch-wide grate on each side with quarter- or fifty-cent-piece-sized holes.

known that the complainant was a public servant "if the person was wearing a distinctive uniform or badge indicating the person's employment as a public servant"). To the contrary, White's testimony about Officer Sixtos retaliating against him for writing a grievance shows that he knew Officer Sixtos was a correctional officer. Therefore, because there is no evidence in the record to permit a jury to rationally find that if White was guilty, he was only guilty of the lesser offense of assault, White was not entitled to a lesser-included offense instruction. *See Hall*, 225 S.W.3d at 536; *Moore*, 969 S.W.2d at 8. We overrule White's third point.

## VI. Punishment

In his fourth, fifth, and sixth points, White complains that the evidence is insufficient to support his punishment and that forty years' confinement is disproportionate to his offense.

## A. Sufficiency

In his fourth and fifth points, White claims that the evidence is insufficient to show that his May 31, 1991 conviction in State's Exhibit 2 became final before the instant offense and to prove that he used or exhibited a deadly weapon. We view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements challenged here beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012).

31

## 1. Enhancement

The first enhancement paragraph alleged that on May 31, 1991, in cause number 599722 in the 177th District Court of Harris County, Texas, White was convicted of felony theft of an automobile and that he had previously been convicted of a felony that had become final prior to the commission of that offense. The second enhancement paragraph alleged that on February 21, 1990, in cause number 556160 in the 183rd District Court of Harris County, Texas, White was convicted of felony theft of an automobile. On White's behalf, the trial court entered a plea of "not true" to each enhancement. The State then reoffered and the trial court accepted into evidence all testimony and physical objects that were introduced during the guilt-innocence phase of trial, which included both judgments of conviction and White's testimony about the offenses.[10]

In his opening brief on appeal, White complained that when the reporter's record was furnished to him, State's Exhibit 2, the May 31, 1991 judgment of conviction, was missing the page that showed the date the judgment was signed and the judge's signature, rendering it insufficient to support the enhancement finding. Finding that White was correct about the missing page, we ordered the

---

[10]During the guilt-innocence phase, among other things, White testified that he had been convicted of two felonies for vehicle theft and judgments of his convictions were entered in evidence. White stated that he did not dispute the accuracy of the court records in State's Exhibits 1 and 2, which contained his prior convictions.

court reporter to prepare, certify, and file in this court a supplemental reporter's record containing the omitted page. *See* Tex. R. App. P. 34.6(d). The court reporter has done so.[11]

When the State seeks to enhance the punishment range for a charged offense by relying on a prior judgment alleged in the indictment, it "must prove beyond a reasonable doubt that (1) a prior conviction exists, and (2) the defendant is linked to that conviction." *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). The State may prove both of these elements by the defendant's admission or by "documentary proof," such as a judgment, that contains sufficient information to establish both elements. *Id.* at 921–22. Once the State links the defendant to a prior judgment, the burden shifts to the defendant to prove the judgment is void. *Sample v. State*, No. 02-11-00292-CR, 2013 WL 2631343, at *4 (Tex. App.—Fort Worth June 13, 2013, pet. filed) (citing *Johnson v. State*, 725 S.W.2d 245, 247 (Tex. Crim. App. 1987)). Based on the complete exhibits now contained in the record, in addition to White's testimony during the guilt-innocence phase, we conclude that the evidence is sufficient to support the finding that his May 31, 1991 conviction was final, and we overrule White's fourth point.

---

[11]In his reply brief, White requested that he be given the opportunity to file a supplemental brief to address this new page if we ordered the record supplemented. We deny this request.

## 2. Deadly Weapon

In his fifth point, White challenges the sufficiency of the evidence to support the deadly weapon special issue and argues that "the question is whether putting a standard office staple . . . on the end of a rolled up piece of paper constitutes a deadly weapon."

### a. Applicable Law

Section 1.07(a)(17) defines "deadly weapon" as "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury" or "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury."   Tex. Penal Code Ann. § 1.07(a)(17) (West 2011 & Supp. 2012); *Mills v. State*, No. 10-11-00144-CR, 2012 WL 2053847, at *3 (Tex. App.—Waco June 6, 2012, pet. ref'd) ("Case law has made it clear that the word 'anything' in the definition of a deadly weapon means just that:  anything.").   "Serious bodily injury" means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."   Tex. Penal Code Ann. § 1.07(a)(46) (West 2011 & Supp. 2012).

To establish that a defendant's use of an item constituted the use of a deadly weapon, the State is not required to introduce the item into evidence; a witness may establish the use of the item as a deadly weapon by describing the item and the manner in which it was used.  *See Magana v. State*, 230 S.W.3d

411, 414 (Tex. App.—San Antonio 2007, pet. ref'd). In *Magana*, as here, the State did not introduce the actual item alleged as a deadly weapon into evidence, and the complainant's injuries appeared to be superficial. *Id.* Therefore, the court looked at whether the item in that case—a knife—was capable of causing death or serious injury in the manner of its use or intended use, considering such factors as its size, shape, and sharpness; the manner of its use or intended use; the nature or existence of inflicted wounds; evidence of its life-threatening capabilities; the physical proximity between the victim and the weapon; and any words spoken by the assailant. *Id.* The court concluded, under the sufficiency standard set out above, that the evidence supported a determination that the knife was a deadly weapon: the appellant came towards the complainant while she was using a pay phone and stabbed her with a pocketknife four times; as he stabbed her, he told her that he wished she would die; the location and number of the wounds required the emergency room doctor to order an x-ray to check the complainant's lungs, heart, and major vessels; and the emergency room doctor testified that although he did not see the knife, he considered a small pocket knife to be a deadly weapon and that it is capable of causing serious bodily injury or death. *Id.*; *see also Martinez v. State*, No. 02-11-00100-CR, 2012 WL 1059465, at *3 (Tex. App.—Fort Worth Mar. 29, 2012, no pet.) (mem. op., not designated for publication) (holding evidence sufficient to support deadly weapon finding when record showed that appellant threatened complainant with death while wielding a pocket knife with a three-to-four inch sharp blade only two

35

inches from the complainant's face); *Simmons v. State*, 106 S.W.3d 756, 758–60, 762–63, 765 (Tex. App.—Texarkana 2003, no pet.) (affirming conviction for aggravated assault with a deadly weapon on a public servant when inmate stabbed correctional officer with a homemade spear composed of a sharpened fragment of chain link fence attached to a paper handle); *Shugart v. State*, 32 S.W.3d 355, 360 (Tex. App.—Waco 2000, pet. ref'd) (op. on reh'g) (holding evidence of possession of deadly weapon sufficient when item was "an ice-pick type weapon" composed of a metal rod that one witness speculated was originally a spring from a night light, the treating nurse testified that the weapon could possibly cause serious injury to the eye or ear or death if used to penetrate the arteries of the neck, and another guard said he had seen inmates seriously injured with weapons like it).

Admission of the weapon, although not critical, greatly aids jurors in determining whether a weapon is capable of causing death or serious bodily injury. *Simmons*, 106 S.W.3d at 763 (stating that the spear-like weapon admitted into evidence was not a deadly weapon per se but could be judged by ordinary jurors to be capable of causing serious bodily injury, given appellant's use and intended use of the weapon). Although here the weapon itself was not admitted, a staple of corresponding size to the one described by Officer Sixtos was admitted as Defendant's Exhibit 5.

### b. Analysis

White argues that "[u]nless there is a rational and logical connection between poking someone on the cheek with a staple and inflicting serious bodily injury or death then no legally sufficient evidence exists for such a finding of deadly weapon."

With regard to the item's size, shape, sharpness, and its use, Officer Sixtos testified that White used a "homemade spear" to jab him in the cheek. He described the spear as around eighteen inches long, with a circumference a bit wider than a No. 2 pencil, made from a rolled up newspaper or magazine that had been wetted over to make it hard, with a metal staple attached at the end. Officer Sixtos said that the spear was never recovered and that this kind of weapon was easily disposed of, by flushing it, tearing it to pieces, or sliding it into another cell.

Officer Beason also testified that usually every cell would have a rod made of paper "but not with a weapon on the end of it." He stated that such paper rods were routinely used by offenders "for traffic and trading," with a line tied to the end so that inmates could pass things between their cells. However, Officer Beason also stated that these rods could be used as weapons and that in the last three and a half years, he had seen one used as a weapon "about a hand full of times." From Officer Sixtos's and Officer Beason's testimonies, the jury could have concluded that the item was used as, and intended by White to be used as, a weapon.

37

With regard to the nature of the inflicted wound and the existence of its life-threatening capabilities, Officer Sixtos testified that the staple went through his cheek and hit him in the top upper part of his gum, leaving a small hole in his face, while White testified that the spot on Officer Sixtos's face was "a busted pimple," not a puncture wound. Photographs that were taken of Officer Sixtos's face after the incident were admitted in evidence, allowing the jury to decide.

Officer Sixtos also testified that "every now and then," he had to take a blood test to make sure that he had not contracted hepatitis C or HIV and that after the incident, his main concern was making sure that he "wasn't fixing to contract any kind of disease from this situation" because the staple could have been dipped in something. He also expressed relief that he had been wearing his eye protection at the time of the assault "because otherwise [White] would have gotten [him] in [his] eye and that could have probably caused some severe damage." During cross-examination, Officer Sixtos said, "Yes," when White's counsel asked him, "Despite the fact that according to you, my client stabbed you in the face for no reason, *potentially exposing you to hepatitis C if you're lucky and AIDS if you're not*, that you don't harbor any ill-will towards my client; isn't that what you said?" [Emphasis added.] Officer Beason noted that Officer Sixtos held his left cheek and was bleeding after the assault.[12]

---

[12]While there was no evidence presented about how HIV, the precursor to the development of AIDS, is transmitted, and White's medical history was not entered in evidence, it appears that this potential consequence of the puncture wound was before the jury in making its deadly weapon finding. *Compare Henry*

38

Viewed in the light most favorable to the deadly weapon finding, the jury could have found that the homemade spear, composed of a staple and paper, fell under the definition of "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury" because the evidence showed that it was capable of puncturing the skin and causing injury, from damage to an unprotected eye to infection with a terminal disease. *See* Tex. Penal Code Ann. § 1.07(a)(17), (46). Therefore, we overrule White's fifth point.

## B. Proportionality

In his sixth point, White argues that forty years' confinement is excessive, cruel, and unusual punishment because it is grossly disproportionate to his offense.

---

*v. State*, No. 08-05-00364-CR, 2007 WL 2405798, at *4 n.3 (Tex. App.—El Paso Aug. 23, 2007, pet. ref'd) (not designated for publication) (leaving open the question of whether it is appropriate to judicially notice scientific facts about HIV transmission), *with Mathonican v. State*, 194 S.W.3d 59, 68–69 (Tex. App.—Texarkana 2006, no pet.) (stating that "it has come to be beyond reasonable debate, generally known, and readily determinable by resort to unassailable sources, that seminal fluid from an HIV-positive man is capable of causing death or serious bodily injury to another person when the HIV-positive man engages in unprotected sexual contact," and concluding that evidence was sufficient to support deadly weapon charge regarding appellant's HIV positive seminal fluid on remand), *Campbell v. State*, No. 05-08-00736-CR, 2009 WL 2025344, at *1, *3 (Tex. App.—Dallas July 14, 2009, pet. ref'd) (not designated for publication) (affirming conviction for harassing a public servant and using or exhibiting a deadly weapon when HIV-positive appellant spit on police officer), *and* Carrie Griffin Basas, *The Sentence of HIV*, 101 Ky. L.J. 543, 563 (2012–2013) ("Negative public reactions to HIV as a deadly threat have not been quashed after three decades of experience with the illness.").

39

Punishment imposed within the statutory limits, as here, is generally not subject to challenge for excessiveness. *See Kim v. State*, 283 S.W.3d 473, 475 (Tex. App.—Fort Worth 2009, pet. ref'd). Subject only to a very limited, "exceedingly rare," and somewhat amorphous Eighth Amendment gross-disproportionality review, a punishment that falls within the legislatively prescribed range and that is based on the sentencer's informed normative judgment, is unassailable on appeal. *See id.* 475–76 (citing *Ex parte Chavez*, 213 S.W.3d 320, 323–24 (Tex. Crim. App. 2006)).

In assessing proportionality, we first make a threshold comparison of the offense against the severity of the sentence. *Moore v. State*, 54 S.W.3d 529, 542 (Tex. App.—Fort Worth 2001, pet. ref'd) (citing *Solem v. Helm*, 463 U.S. 277 291–92, 103 S. Ct. 3001, 3010 (1983); *McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992), *cert. denied*, 506 U.S. 849 (1992)). Only if we determine that the sentence is grossly disproportionate to the offense do we need to consider whether the sentence is comparable to sentences imposed upon other criminals in the same jurisdiction and sentences imposed for commission of the same crime in other jurisdictions. *Robertson v. State*, 397 S.W.3d 774, 776 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

In making our threshold inquiry, we judge the gravity of the offense in light of the harm caused or threatened to the victim or society and the offender's culpability. *Solem*, 463 U.S. at 291–92, 103 S. Ct. at 3010. Here, White was accused of assaulting a public servant, which is a third degree felony. *See* Tex.

Penal Code Ann. § 22.01(b) (stating that intentionally, knowingly, or recklessly causing bodily injury to another is a class A misdemeanor except when, among other things, the offense is committed against a person the actor knows is a public servant while the public servant is lawfully discharging an official duty). The jury found that White had committed the assault with a deadly weapon, and the evidence presented at trial allowed the jury to conclude that the weapon could have infected the complainant with a disease or caused other harm to him or others.

The jury also heard testimony about White's behavior in prison. White testified that he had served all twenty years of his sentence for vehicle theft because he had been denied parole four times. He agreed on cross-examination that he had lost his good time credit for misconduct.[13] At the time of the offense in this case, White had spent three years in administrative segregation; he had also previously spent a period of five years in administrative segregation while serving the twenty-year sentence. White said that the first time he was placed in administrative segregation, he had been accused of assaulting an officer but that the officer had actually assaulted him and then lied about it. White said that the second time he was placed in administrative segregation, it was because the

---

[13]White had three years left on the twenty-year sentence at the time of the offense in this case, and he finished that sentence while awaiting trial in the instant case.

41

officers claimed he was aggressive but that they were lying because he had been "writing officers up."

The jury also heard about White's unpleasant behavior while awaiting trial in this case and his previous felony convictions, which enhanced the punishment range that the jury could consider to "imprisonment . . . for life, or for any term of not more than 99 years or less than 25 years." *Id.* § 12.42(d) (West 2011 & Supp. 2012).

Based on the evidence in this case, and particularly in light of the punishment range, we cannot say that the jury's forty-year sentence is grossly disproportionate to the offense. Therefore, we do not reach the question of whether the sentence is comparable to sentences imposed upon other criminals in the same jurisdiction and sentences imposed for commission of the same crime in other jurisdictions. *But cf. Guy v. State*, No. 12-05-00244-CR, 2006 WL 2361445, at *2 (Tex. App.—Tyler Aug. 16, 2006, pet. ref'd) (mem. op., not designated for publication) (concluding that appellant's life sentence for aggravated assault of a public servant was not unconstitutionally disproportionate); *Maldonado v. State*, No. 12-03-00429-CR, 2005 WL 2862223, at *1, *4 (Tex. App.—Tyler Oct. 31, 2005, pet. ref'd) (mem. op. on reh'g, not designated for publication) (holding that, even absent waiver, thirty-year sentence for aggravated assault on a public servant with a deadly weapon was not unconstitutionally disproportionate). We overrule White's sixth point.

42

## VII.  Conclusion

Having overruled all of White's points, we affirm the trial court's judgment.


PER CURIAM

PANEL:  MCCOY, WALKER, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 15, 2013